**FILED**

MAY 2 2 2014

Clerk, U. S. District Court
Eastern District of Tennessee
At Knoxville

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE

)
THE UNITED STATES OF AMERICA, THE ) Civil Action No.: 3:14 -cv-212
STATE OF TENNESSEE and THE STATE OF ) Varlan / Guyton
VIRGINIA *ex rel*. BARBARA HINKLE, )
)
Plaintiffs, )
)
vs. )
) **FILED UNDER SEAL**
CARIS HEALTHCARE, L.P. ) **Pursuant to 31 U.S.C. § 3730(b)(2)**
)
Defendant. )
)
)
)

### COMPLAINT

*Qui tam* relator, Barbara Hinkle, brings this action under the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq*. (hereafter "FCA"), the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181, *et seq*. ("hereafter "Tennessee FCA"), and the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1, *et seq*. (hereafter "Virginia FCA"), on behalf of the United States of America and the states of Tennessee and Virginia to recover funds of which the federal and state governments have been defrauded. Relator's allegations are based upon her own knowledge and an investigation undertaken by her counsel. Relator alleges the following:

### NATURE OF THE CASE

1.     This *qui tam* action is an effort to restore to the United States and the states of Tennessee and Virginia millions of dollars that Defendant, Caris Healthcare, L.P. has taken through a systematic, long-lived, and continuing fraud, perpetrated through the Medicare and Medicaid programs.

1

2. The frauds alleged herein were perpetrated in 2013, are continuing to the present and, on information and belief, were also perpetrated prior to 2013.

## PARTIES

3. During the time period relevant to this Complaint, Relator, Barbara Hinkle, was a citizen of the State of Tennessee. From February 4, 2013 until December 18, 2013, Ms. Hinkle was employed as a registered nurse/case manager in Caris Healthcare's Bristol, Virginia location.

4. Defendant, Caris Healthcare, L.P. ("Caris"), is a Tennessee domestic limited partnership whose principal address is Suite A-301, 9000 Executive Park, Knoxville, TN 37923-4685. The limited partnership is structured such that Caris and National HealthCare Corporation (a publically traded Delaware corporation) own both general and limited partnership interests in Caris.

5. The United States is a real party in interest under the FCA and ultimately paid the false claims alleged herein (Medicare claims in full and Medicaid claims in part) and is entitled to the bulk of the recovery sought by this action. Medicare is a federal health insurance program administered by the Centers for Medicare & Medicaid Services ("CMS") for the elderly and disabled. *See* 42 U.S.C. §§ 1395-1395hhh. Medicaid is a jointly-funded federal and state public-assistance program that pays for certain medical expenses incurred by low-income patients. *See* 42 U.S.C. §§ 1396-1396v.

6. The State of Tennessee is a real party in interest under the Tennessee FCA, Tenn. Code Ann. § 71-5-181, *et seq.*, and ultimately paid a portion of the false Medicaid claims alleged herein. *See* 42 U.S.C. §§ 1396-1396v.

2

7. The State of Virginia is a real party in interest under the Virginia FCA, Va. Code Ann. § 8.01-216.1, *et seq.*, and ultimately paid a portion of the false Medicaid claims alleged herein. *See* 42 U.S.C. §§ 1396-1396v.

## JURISDICTION AND VENUE

8. Relator brings this action on behalf of the United States under the *qui tam* provisions of the FCA, the state of Tennessee under the Tennessee FCA and the state of Virginia under the Virginia FCA.

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 31 U.S.C. §§ 3732(a), which confer jurisdiction over actions brought under 31 U.S.C §§ 3729 and 3730. This Court has supplemental jurisdiction over the counts asserted under the Tennessee FCA and Virginia FCA, pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b).

10. This Court has personal jurisdiction over Defendant, and venue is proper in this District pursuant to 31 U.S.C. § 3732(a), because Defendant is found, transacts business, and committed violations of 31 U.S.C. § 3729 in this District.

11. This action is not based upon the prior public disclosure of allegations or transactions in a Federal or state criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other Federal or state report, hearing, audit, or investigation; in the news media; or in any other form as the term "publicly disclosed" is defined in 31 U.S.C. § 3730(e)(4)(A), Tenn. Code Ann. § 71-5-183(e)(1)-(2)(A) or Va. Code Ann § 8.01-216.8.

12. To the extent there has been a public disclosure unknown to Relator, she is an original source under 31 U.S.C. § 3730(e)(4), Tenn. Code Ann. § 71-5-183(e)(2)(A) and Va. Code Ann § 8.01-216.8. Relator, prior to any such public disclosure, voluntarily disclosed to the Government the information on which her allegations are based and/or has knowledge that is

3

independent of and materially adds to the publicly disclosed allegations or transactions and voluntarily provided the information to the Government before filing this action.

## RELEVANT STATUTES AND REGULATIONS

### THE FALSE CLAIMS ACT, 31 U.S.C. § 3729, *et seq.*

13. The False Claims Act imposes liability on any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval (hereafter "false claim"). 31 U.S.C. § 3729(a)(1)(A).

14. The FCA defines "claim" to include any request or demand, whether under contract or otherwise, for money that is made to an agent of the United States or to a contractor if the money is to be spent to advance a government program or interest and the government provides or will reimburse any portion of the money. 31 U.S.C. § 3729(b)(2).

15. The FCA defines "knowingly" to mean actual knowledge, deliberate ignorance of truth or falsity, or reckless disregard of truth or falsity. A specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1).

16. The FCA also imposes liability on any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim (hereafter "false statement"). 31 U.S.C. § 3729(a)(1)(B). The FCA defines "material" to mean having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. 31 U.S.C. § 3729(b)(4).

### MEDICARE AND MEDICAID

17. Medicare is a federal health insurance program created by Congress in 1965 for the elderly and disabled. *See* 42 U.S.C. §§ 1395-1395hhh. It is the nation's largest health insurance program and covers nearly 40 million people. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"). Medicare pays doctors, hospitals, hospices, and

4

other providers and suppliers of medical goods and services according to government-established rates. *Id.*

18.     Medicare is divided into parts A, B, C and D. Medicare Part A is relevant to this action.

19.     Medicare Part A provides federal payment for inpatient hospital care, post-hospital extended care services, home health care and hospice. *See* 42 U.S.C. §§ 1395c-1395d.

20.     A person may elect to receive hospice care as a benefit under Medicare Part A if the person is certified to be terminally ill. A person is terminally ill if, in the clinical judgment of the hospice medical director or physician member of the interdisciplinary group and person's attending physician, the person is expected to live six (6) months or less if the illness runs its normal course.

21.     When a Medicare beneficiary elects to receive hospice care, the beneficiary no longer receives, or is entitled to receive, services that would help to cure his or her illness. Instead the beneficiary receives what is called palliative care, or care that is aimed at relieving pain, symptoms, or stress of terminal illness, which includes a comprehensive set of medical, social, psychological, emotional, and spiritual services.

22.     Medicaid was also created by Congress in 1965. *See* 42 U.S.C. §§ 1396-1396v. Medicaid is a public-assistance program that pays for medical expenses incurred by low-income patients. The Medicaid program pays for services pursuant to plans developed by the states and approved by the U.S. Department of Health and Human Services ("HHS") through CMS. *See* 42 U.S.C. § 1396a(a)-(b). States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical goods and services according to government-established rates. *See* 42 U.S.C. § 1396b(a)(1), 1903(a)(1). The federal government then pays each state a statutorily

5

determined percentage of "the total amount expended . . . as medical assistance under the State plan . . . " *See* 42 U.S.C. § 1396b(a)(1). This federal-to-state payment is known as federal financial participation.

23.     Some Medicare enrollees that have limited income and limited resources are entitled to Part A benefits, as well as Medicaid benefits. These enrollees, often referred to as dual eligibles, are entitled to benefits ranging from payment of certain costs, such as Medicare premiums, to full benefits under Medicaid. Whether entitled to full or partial Medicaid benefits, Medicare serves as the primary insurer and Medicaid as the secondary insurer for dual eligible participants.

### COMPLIANCE WITH MEDICARE REGULATIONS IS A PRE-REQUISITE FOR PAYMENT UNDER BOTH PROGRAMS

24.     To be eligible to collect Medicare or Medicaid payments, a provider must enroll with those programs by submitting a Form CMS-855A application and supporting documentation to Medicare. When submitting Form CMS-855A, the applying provider must certify that it "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity." Once the provider's application is accepted by Medicare, the provider is then eligible to receive Medicare payments. Similarly, if the provider's application is accepted by Tennessee or Virginia's Medicaid programs, a prerequisite of which is acceptance by Medicare, the provider is then eligible to receive Medicaid payments.

25.     Claims for payment submitted to the Government in knowing violation of any material rules or requirements constitute false claims for purposes of the FCA, Tennessee FCA and Virginia FCA. By the same token, certifications falsely attesting to compliance with such

material requirements constitute false statements for purposes of the FCA, Tennessee FCA and Virginia FCA.

## MEDICARE'S HOSPICE PROVIDER REQUIREMENTS

26.     Medicare pays for hospice care to eligible members if the Medicare enrolled hospice meets certain requirements.

27.     As defined in 42 C.F.R. § 418.3, "hospice care" is a "comprehensive set of services described in 1861(dd)(1) of the Act, identified and coordinated by an interdisciplinary group to provide for the physical, psychosocial, spiritual, and emotional needs of a terminally ill patient and/or family members, as delineated in a specific patient plan of care."

28.     Hospice providers must provide certain core services: physician services, nursing services, medical social services and counseling services, including bereavement counseling, dietary counseling and spiritual counseling. 42 C.F.R. § 418.64.

29.     Medicare mandates an interdisciplinary approach to hospice care. Accordingly, hospice providers must have an interdisciplinary group(s) that prepares a written plan of care, in consultation with the patient's attending physician. This interdisciplinary group ("IDG") must be composed of a doctor of medicine or osteopathy, a registered nurse, a social worker and a pastoral or other counselor. 42 C.F.R. § 418.56(a).

30.     The written plan of care formulated by the IDG must be individualized to the patient and contain the following:

a.  Interventions to manage the patient's pain and symptoms;

b.  A detailed statement of the scope and frequency of services necessary to meet the specific patient and family needs;

7

    c.   Measurable outcomes anticipated from implementing and coordinating the plan of care;

    d.   Drugs and treatment necessary to meet the patient's needs;

    e.   Medical supplies and appliances necessary to meet the patient's needs; and

    f.   The IDG's documentation of the patient's or representative's level of understanding, involvement, and agreement with the plan of care, in accordance with the hospice's policies, in the clinical record.

42 C.F.R. §§ 418.56(b)-(c).

31.    The IDG must also "review, revise and document the individualized plan as frequently as the patient's condition requires, but no less frequently than every 15 calendar days. A revised plan of care must include information from the patient's updated comprehensive assessment and must note the patient's progress toward outcomes and goals specified in the plan of care." 42 C.F.R. § 418.56(d).

32.    In addition to formulating an individualized plan of care, the IDG must also complete a comprehensive assessment that identifies each patient's physical, psychosocial, emotional and spiritual needs related to that patient's terminal illness. The comprehensive assessment must consider the following:

    a.   The nature and condition causing admission;

    b.   Complications and risk factors that affect care planning;

    c.   The patient's functional status, including the patient's ability to understand and participate in his or her own care;

    d.   Imminence of death;

    e.   Severity of symptoms;

8

f.  The patient's prescription drugs, over-the-counter drugs, herbal remedies and other alternative treatments that could affect the patient's drug therapy;

g.  Bereavement needs; and

h.  The need for referrals and further evaluation by other health professionals.

42 C.F.R. § 418.54(c).

33.    Like the written plan of care, the comprehensive assessment must be updated by the IDG as frequently as the patient's condition requires, but no less frequently than every 15 days.  42 C.F.R. § 418.54(d).

**MEDICARE'S HOSPICE BENEFIT**

34.    Hospice is a program that provides palliative care, instead of curative care, to patients.  Palliative care is aimed at relieving pain, symptoms, or stress of terminal illness.  It includes a comprehensive set of medical, social, psychological, emotional, and spiritual services provided to a terminally ill individual. Medicare recipients who elect hospice care agree to forego curative treatment of their terminal illnesses. In other words, patients who receive the Medicare hospice benefit no longer receive care that leads to a cure of their illnesses.

35.    A person who is entitled to receive benefits under Medicare Part A and has been certified terminally ill may elect to receive hospice care by filling out an election statement that identifies the hospice provider; acknowledges that hospice provides palliative, not curative, care; acknowledges that certain Medicare services are waived by electing hospice care; identifies the effective date of the election; and is signed by the electing person or person's representative.

36.    A Medicare beneficiary may elect to receive Medicare hospice benefits for an unlimited number of election periods.  The election periods consist of an initial ninety (90) day

9

period, followed by a second ninety (90) day period and then an unlimited number of sixty (60) day periods.

37.     When a patient initially elects to receive hospice, the hospice provider must obtain an oral or written certification of the patient's terminal illness (i.e. is expected to live six (6) months or less if the illness runs its normal course) no later than two days after hospice care is initiated. This certification must be obtained from the hospice's medical director or physician member of the hospice's IDG and the patient's attending physician, if the patient has one. Although the certification may be obtained orally, the hospice must obtain the certification in writing before submitting a claim to Medicare.

38.     For the second ninety (90) day period and subsequent sixty (60) day periods, the hospice must obtain a written certification from the hospice's medical director or physician member of the hospice's IDG within two (2) calendar days after the first day of each period. This written certification must state that the hospice patient's life expectancy is six (6) months or less if the terminal illness runs its course; contain specific clinical findings and other documentation that supports a life expectancy of six (6) months or less; identify the benefit period for which the certification covers; and be signed and dated by the medical director or physician member of the IDG.

39.     For written certifications after October 1, 2009, the certifying medical director or physician must also include a brief narrative explaining the clinical findings supporting the hospice patient's life expectancy. The narrative must synthesize the patient's comprehensive medical information and reflect the patient's individual clinical circumstances. In the narrative, the certifying medical director or physician must also confirm that the narrative was composed based on a patient examination or a review of the patient's medical record.

10

40. Beginning January 1, 2011, re-certifications beginning with the third benefit period (or first sixty (60) day period), require the certifying medical director, physician or hospice nurse practitioner to conduct a face-to-face encounter with the hospice patient and explain in the narrative why the clinical findings of the face-to-face encounter support the hospice patient's life expectancy.

41. These written certifications must be on file in the hospice patient's medical record prior to submitting a claim for payment to Medicare. 42 C.F.R. § 418.22(a)(1)-(3). This requirement is a prerequisite to receiving Medicare payment for hospice services. *See* 42 U.S.C. § 1395f(7)(A).

42. It is a condition of participation that hospices must maintain a clinical record for each hospice patient that contains "correct clinical information." All entries in the clinical record must be "legible, clear, complete, and appropriately authenticated and dated..." 42 C.F.R. § 418.104.

43. Medicare's regulations governing hospices require the hospice medical record to include "clinical information and other documentation that support the medical prognosis" and "the physician must include a brief narrative explanation of the clinical findings that supports a life expectancy of 6 months or less as part of the certification and recertification forms." 42 C.F.R. § 418.22(b)(2) and (3).

44. When a patient is certified and elects to receive hospice care, Medicare pays for doctor's services, nursing care, medical equipment and supplies, drugs for pain relief or symptom control, hospice aid and homemaker services, physical and occupational therapy, speech-language pathology services, social worker services, dietary counseling, grief and loss counseling, short-term inpatient care when needed for pain and symptom management, short-

11

term respite care and any other services that are covered by Medicare to manage the patient's pain or symptoms related to the terminal illness.

45.     Medicare pays hospice providers a daily rate, independent of the services provided on any particular day. Depending on the level of care needed by the hospice patient, the daily payment differs. The four levels of care are routine home care, continuous home care, inpatient respite care and general inpatient care.

46.     Routine home care is provided in the hospice patient's home and is billed when the patient is not receiving continuous home care, inpatient respite care or general inpatient care.

47.     Continuous home care is billed when the hospice patient is in a period of crisis and hospice services are needed for a minimum of eight (8) hours in a twenty-four hour period, with at least four (4) hours of care being provided by a registered nurse or licensed practice nurse, provided to maintain the hospice patient at home.

48.     Inpatient respite care is billed when the hospice patient is admitted as an inpatient to a Medicare or Medicaid certified hospital, skilled nursing facility, hospice facility or nursing facility to receive respite care for no more than five (5) days.

49.     General inpatient care is billed when a hospice patient is admitted to a Medicare certified hospice facility, hospital or skilled nursing facility to receive general inpatient care.

50.     Hospices bill Medicare on a calendar month basis for their eligible beneficiaries.

51.     Medicare's hospice benefit is only available to those persons who are terminally ill as documented in the written certifications that must be contained in each hospice patient's medical record.

52.     Medicare directs hospice providers to "have in place a discharge planning process that takes into account the prospect that a patient's condition might stabilize or otherwise change

12

such that the patient cannot continue to be certified as terminally ill." 42 C.F.R. § 418.26(d)(1). Accordingly, a hospice must discharge a hospice patient if it determines that the patient is no longer terminally ill.

## MEDICAID'S HOSPICE BENEFITS

53.     Under its TennCare Medicaid program, Tennessee offers certain medical benefits to qualifying individuals, including hospice.

54.     Virginia likewise offers hospice and other medical benefits to qualifying individuals under its Medicaid program.

55.     The election, certification and recertification requirements under TennCare and Virginia's Medicaid programs are substantially similar, and in many respects identical, to Medicare's requirements.   Under both Medicare and Medicaid, the hospice benefit is only available to those persons who are terminally ill.

## CARIS

56.     Caris is a hospice provider with 25 locations in South Carolina, Tennessee and Virginia.   Although its locations are spread across three states, Caris' billing department is located at its headquarters in Knoxville, Tennessee.

57.     Caris is a Medicare and Medicaid certified hospice provider, and the vast majority of its patients are Medicare or Medicaid beneficiaries.

58.     At each of Caris' locations, Caris employs an office administrator, office manager, chaplain, marketer, social worker, volunteer coordinator, patient care manager and registered nurses/case managers.

59.     The office administrator oversees the nurses and other staff that work for Caris. The office administrator ensures the employees carry out their daily activities and assignments;

receives and addresses patient concerns or complaints; reschedules nursing visits if the patient cannot be seen on a particular day; schedules and coordinates the quarterly meetings; conducts the initial hiring interviews; communicates with Caris' corporate headquarters; and communicates any pertinent information from Caris' corporate headquarters to its employees.

60.     The office manager works as the assistant to the office administrator, assisting the office administrator in fulfilling her numerous responsibilities.

61.     The patient care manager is a registered nurse who supervises the registered nurses/case managers, schedules the nurses' visits to hospice patients, ensures that the hospice patients are seen, notifies nurses to visit patients if Caris receives a call that they are doing poorly and makes sure that the nurses are properly caring for patients and maintaining the proper documentation.

62.     The chaplain sees hospice patients from one to three times a month to provide spiritual care and fulfill spiritual needs. The chaplain may visit, talk and pray with the patient or family members. These visits are documented by the chaplain on a Caris issued laptop.

63.     The social worker sees hospice patients from one to three times per month to address and try to fulfill any care related needs the patient or family might have. Thus, the social worker may be contacted to try to find assistance for a hospice patient or the patient's caregiving family who needs help paying bills, obtaining clothing, getting vitamin supplements, filling out Medicaid paperwork or finding a nursing home or other facility to place a hospice patient.

64.     The volunteer coordinator oversees volunteers who help with hospice patients, tracks volunteer hours and coordinates volunteer events. Hospice volunteers, as well as the volunteer coordinator, will visit and socialize with hospice patients as needed.

14

65.     Caris' nurses or case managers visit hospice patients in their homes, hospitals or nursing facilities. Caris' nurses are required to visit each patient between 1 to 3 times per week depending on the patient's condition, document how the patient is doing and assist in making the patient comfortable.

66.     The marketer visits hospitals, skilled nursing facilities, doctors' offices and other organizations to provide education on hospice.

### CARIS' FRAUDULENT BEHAVIOR: EMPHASIS ON THE CENSUS

67.     Relator, Barbara Hinkle, was employed by Caris in its Bristol, Virginia location as a registered nurse/case manager from February 4, 2013 to December 18, 2013. Relator was one of three nurses, along with an office administrator, marketer, chaplain and volunteer coordinator employed by Caris.

68.     The medical director for Caris' Bristol, Virginia location is James Schrenker, M.D.

69.     The office administrator at Caris' Bristol, Virginia location is Angie Hamblin. Because Caris' Bristol location did not employ a patient care manager during the time period relevant to this Complaint, Ms. Hamblin performed the duties of the patient care manager.

70.     During the time period relevant to this Complaint, Cindy Jacquemin was the nursing supervisor for Caris' eastern region, encompassing Bristol, Virginia, Johnson City, Tennessee, and Greeneville, Tennessee. Ms. Jacquemin supervised the patient care managers in these locations and would regularly visit the Bristol location.

71.     As a hospice nurse, Relator was responsible for performing initial admission assessments, visiting patients on a daily basis, providing palliative care to patients, attending IDT

meetings and documenting the clinical findings that would support admitting or recertifying a patient for hospice care.

72. Caris places great emphasis on growing and maintaining its census (i.e.: hospice patient population). At its Bristol location, Caris had a stated census goal of 50. Caris Bristol, however, never reached this goal, instead maintaining a census between 20-40 patients. The pressure to reach the census goal, however, resulted in several practices designed to ensure that patients were admitted and perpetually recertified for Medicare and Medicaid's hospice benefits.

**Caris' Admission Fraud**

73. Caris' hospice patients are primarily referred from doctors, hospitals or nursing homes. In fact, Caris sends its marketers to doctors' offices, hospitals and nursing homes to provide presentations on the benefits of hospice care that Caris provides. Caris also tells its nurses who visit patients in hospitals or nursing homes to speak with the directors of nursing, nurse supervisors or floor supervisors to promote Caris and ask if they have any patients who are hospice appropriate.

74. When Caris is sent a hospice referral, it is accompanied by the patient's demographic information. This includes pertinent medical information, including diagnoses, and demographic information, such as contact and insurance information.

75. Upon receiving a hospice referral, Caris oftentimes send its marketer, chaplain, social worker, or other non-medical employee to perform a "go-see." The "go-see" involves the non-medical employee visiting the patient and patient's family, and reviewing the patient's medical chart. The non-medical employee then offers a recommendation to Caris' office administrator on whether the referred patient should be admitted. If the non-medical employee recommends the patient be admitted, one of Caris' nurses conducts an admission assessment.

16

76. The admission assessment involves the nurse personally visiting the patient, conducting a head-to-toe assessment, reviewing the patient's medications and reviewing the patient's primary diagnosis and secondary diagnoses, if any. After conducting a thorough investigation of the patient, the nurse will make a recommendation about whether the patient should be admitted to hospice.

77. If the nurse determines the patient is appropriate for hospice admission, then the nurse will fill out Caris' admission form. Once completed, the admission form is sent to the patient's attending physician, if the patient has one, and Caris' medical director so they can review and certify the patient as having a terminal illness, if appropriate. During Relator's employment, once the admission form was filled out, Dr. Schrenker, Caris' Bristol, Virginia medical director, and/or the patient's attending physician always certified the patient as having a terminal illness and admitted the patient.

78. In determining whether a referred patient should be admitted, Caris instructs its employees to look at the patient's primary diagnoses and related diagnoses. If there is any diagnosis in the patient's chart that supports finding a terminal illness, Caris instructs its employees that the patient should be certified as being appropriate for hospice admission.

79. Caris would also audit patient's admission files to review the diagnosis that was listed which qualified the patient for hospice admission. If a patient had multiple diagnoses, Caris instructed its nurses to list the most severe diagnosis as the primary diagnosis because Caris would be paid more money.

80. Notwithstanding the aforementioned directives, Relator would inform Angie Hamblin, the office administrator that she was not recommending a patient for admission based on her admission assessment. Generally, this elicited one of two responses from Ms. Hamblin.

17

81.     Sometimes, Ms. Hamblin told Relator that "you need to find something to make them hospice appropriate" and take the patient's file. If the patient had multiple diagnoses, Ms. Hamblin, who is not a registered nurse or medical professional, would find any diagnosis that would qualify the patient for hospice and tell Relator to admit the patient based on that diagnosis. Other times, Ms. Hamblin would send one of the other nurses to perform the admission assessment again to have the patient admitted. At least three to five times a month, if not more, Ms. Hamblin would have patients admitted that Relator indicated were not appropriate based on the admission assessment.

82.     On one particular occasion, Relator returned from an admission assessment and told Ms. Hamblin that she was recommending the patient not be admitted. Ms. Hamblin reviewed the patient's file and instructed Relator to admit the patient with a stroke diagnosis because the patient had a history of a stroke. Relator had already reviewed the patient's medical history of stroke and did not believe her assessment supported admitting the patient for hospice. However, Relator reluctantly followed Ms. Hamblin's directive because she was afraid she would be fired and needed the employment.

**Caris' Recertification Fraud**

83.     Once patients were admitted, Caris made sure Dr. Schrenker and the nurses knew that the patients needed to be recertified, whether it was appropriate or not.

84.     To recertify a patient for hospice, hospice providers are required to make specific clinical findings and provide other documentation that supports a finding that the patient has a life expectancy of six (6) months or less if the terminal illness runs its natural course. To fulfill this duty, Caris' nurses visit patients one to three times per week, the frequency depending on whether the patient is stable, declining or active (a term Caris uses to describe a person who is dying).

18

85. As part of her duties to document clinical findings that would support recertification, Relator performed a general physical and functional assessment and documented her findings. This involved, among other things, measuring the patient's temperature, pulse and weight; performing a skin assessment; checking extremities; and listening to the bowels and to the heart.

86. Relator also recorded her observations and asked the patient's caregiver or family about signs that would indicate the patient was declining due to the patient's terminal illness. Relator would observe and ask about the patient's nutritional intake, pain level, amount of sleep, quality of sleep, ability to ambulate and ability to swallow. Relator would also observe and ask whether the patient was getting weaker, needed more assistance performing activities of daily living, had difficulty breathing and was taking prescribed medications. Relator also looked for signs that the patient would die soon.

87. Relator's observations and findings from each visit were recorded on a Caris issued laptop using McKesson software specifically marketed for hospice. These assessment notes were electronically documented and saved in each patient's electronic medical record. Once Relator finished entering her assessment notes, saved them and closed out of the patient's medical record, the software locked the assessment notes so that they could not be altered or edited. The only way to have an assessment note re-opened was to call corporate headquarters and ask for permission to have the assessment note re-opened.

88. Once a visit was completed, the office administrator and PCM could view and access the assessment notes and also see how much time was spent on each patient visit.

89. Within a few months of being hired, Relator was verbally instructed by Cindy Jacquemin, Caris' nursing supervisor for its eastern region, to "chart negatively." As explained

19

by Ms. Jacquemin, when Relator visited patients, she was only to document signs or symptoms in her assessment notes that showed her patients were declining due to their terminal disease. Relator was likewise instructed not to document any signs or symptoms that would indicate the patient was improving. To ensure that Relator understood what was expected, Ms. Jacquemin provided examples of the types of negative findings that could be documented that would support recertifying the patient. From time to time, Ms. Jacquemin also sent emails or typewritten notes explaining what information should be documented in patient charts so they were charted negatively.

90. In response to being told to chart negatively, Relator told Ms. Jacquemin that she would document what she observed and would not document what she did not see. Ms. Jacquemin responded that Relator needed to chart negatively so that Caris could keep the patient in hospice.

91. Ms. Jacquemin or Ms. Hamblin also informed Dr. Schrenker of the importance of showing the patient was declining so that Caris could recertify the patient for hospice.

92. Once or twice every month, Ms. Jacquemin would visit the Bristol location. Each time she visited, Ms. Jacquemin would call Caris' corporate headquarters and have certain of Relator's assessment notes reopened so they could be edited. Having reviewed Relator's findings and observations, Ms. Jacquemin would print off written notes that were typed on her computer and put them into Relator's mailbox at the Bristol office. These notes would instruct Relator to add certain negative comments or findings that would indicate the patient was declining and therefore, hospice appropriate. For example, Ms. Jacquemin would review the assessment notes to determine whether the patient's weight or arm circumference had decreased.

20

If there was any decrease, Ms. Jacquemin would instruct Relator to add this finding to the patient's assessment note as a sign the patient was declining.

93.     Sometimes, Ms. Jacquemin's written notes would direct Relator to return the note to Ms. Hamblin after Relator had carried out Ms. Jacquemin's instructions. Relator would then either write a check mark or write "done," followed by her initials, and return it to Ms. Hamblin once she was finished.

94.     Additionally, Relator and other nurses she worked or spoke with discovered that information they had put in the assessment notes – which would have indicated that patients were improving or otherwise unsuitable for hospice care -- had been deleted.

95.     Despite the mandate to chart negatively, Relator would remark, at times, to Ms. Hamblin that certain of her patients were either stable or improving and not appropriate for hospice recertification. Ms. Hamblin told Relator to raise the issue in the IDT meeting.

96.     The bi-weekly IDT meetings are a time for the medical director, nurse and other staff to discuss each patient and raise issues regarding the patient's care. The IDT meetings are attended by Dr. Schrenker, the office administrator, chaplain, social worker, marketer and at least one nurse. Input is received by all members of the IDT group.

97.     When Relator had patients that were stable or showed signs of improvement, she identified them and briefly explained the supporting findings and observations to the IDT group. Dr. Schrenker then placed the patient "on radar" as a possible candidate for discharge.

98.     If the patient was reported to be stable or improving for three consecutive IDT meetings, then Caris' policy was to discharge the patient. To the uninitiated, Caris had a discharge planning process as required by Medicare. In practice, Caris' oft repeated and well known desire to recertify patients for hospice resulted in practically no patient being discharged.

21

99.     If a patient that was placed "on radar" was about to be discharged because Relator reported he or she was stable or improving, then some member of the IDT group (i.e.: social worker, volunteer coordinator or chaplain) who had seen the patient would identify some sign(s) that would support finding the patient was declining. Notwithstanding the fact that Relator had the most contact with her patients, as long as any member of the IDT group stated the patient was declining or doing worse, the patient would be recertified for hospice.

100.    In September or October 2013, Caris sent a memo to Ms. Hamblin to be distributed to Relator and the other nurses. As explained by Ms. Hamblin, the memo instructed the nurses not to discuss how well a patient was doing during the bi-weekly IDT meetings. Instead, the nurses were to simply say the patient was declining or active (meaning the patient was dying). Otherwise, the nurses were instructed to say nothing. This new policy, when coupled with the mandate to chart negatively, effectively ensured that patients would be perpetually recertified.

101.    As one example of Caris' perpetual recertification, Relator was assigned patient G.B., who was diagnosed with Alzheimer's disease and mild chronic obstructive pulmonary disease. G.B. had been admitted to hospice prior to Relator's employment. During Relator's employment, G.B. was stable and her condition never declined. Nevertheless, G.B. was always recertified for hospice and was still in hospice after Relator left Caris. After Relator left Caris, the nurse who was assigned to G.B. told Relator that she had to recertify G.B. for hospice but did not know what basis she had to do so.

102.    Although Relator primarily worked at Caris' Bristol location, she would sometimes be sent to the Johnson City office to visit patients on an as-needed basis. Relator met and interacted with nurses who were employed at this office. Based on discussions with several

of these nurses, Relator learned that Caris also told its Johnson City nurses to chart negatively so Caris could recertify the patient for hospice benefits.

## Count I (Submission of False or Fraudulent Claims in Violation of 31 U.S.C. § 3729(a)(1)(A))

103.    Relator re-alleges paragraphs 1-102 as if fully set forth herein.

104.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

105.    The FCA makes it unlawful for any person to knowingly present a false or fraudulent claim for payment or approval.

106.    Caris submits monthly claims for payment to Medicare for hospice services provided to patients who have elected to receive hospice care and chose Caris as the hospice provider.

107.    Between 40-50% of these claims are false or fraudulent because Caris knowingly admits and recertifies patients who are not appropriate for hospice services, as set forth above.

108.    The United States, unaware of the false or fraudulent nature of these claims, paid the claims submitted by Caris and would not have done so had it known the patients were not eligible for hospice.

109.    By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount to be proven at trial.

## Count II (Using a False Record Statement Material to a False or Fraudulent Claim in Violation of 31 U.S.C. § 3729(a)(1)(B))

110.    Relator re-alleges paragraphs 1-102 as if fully set forth herein.

111.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

23

112.   The FCA makes it unlawful for any person to knowingly make or use a false record or statement that is material to a false or fraudulent claim.

113.   As set forth above, Caris admits and recertifies patients who are not appropriate for admission because they do not have a terminal illness (i.e.: a life expectancy of less than six months if the patient's illness runs its natural course).

114.   Between 40-50% of Caris' claims for payment to Medicare are false or fraudulent because the documentation supporting the certification that the patient has a terminal illness is knowingly doctored or manipulated to paint a false picture that the patient is eligible and appropriate for hospice benefits.

115.   A prerequisite to receiving payment from Medicare for hospice benefits is that the patient be certified as having a terminal illness. Medicare will not pay hospice benefits for a patient whose illness is not terminal.

116.   As set forth above, many of Caris' patients are falsely certified as having a terminal illness when, in fact, they do not have one.

117.   The United States, unaware of the false or fraudulent nature of these certifications, paid the claims submitted by Caris and would not have done so had it known the certifications were false.

118.   By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount to be proven at trial.

### Count III (Submission of False or Fraudulent Claims in Violation of Tennessee Code § 71-5-182(a)(1)(A))

119.   Relator re-alleges paragraphs 1-102 as if fully set forth herein.

120.   This is a claim for treble damages and civil penalties under the Tennessee FCA, Tenn. Code Ann. § 71-5-181(a)(1)(A).

24

121.    The Tennessee FCA makes it unlawful for any person to knowingly present a false or fraudulent claim for payment or approval.

122.    Caris submits monthly claims for payment to TennCare for hospice services provided to patients who have elected to receive hospice care and chose Caris as the hospice provider.

123.    Between 40-50% of these claims are false or fraudulent because Caris knowingly admits and recertifies patients who are not appropriate for hospice services, as set forth above.

124.    The United States and Tennessee, unaware of the false or fraudulent nature of these claims, paid the claims submitted by Caris and would not have done so had they known the patients were not eligible for hospice.

125.    By reason of these payments, the United States and Tennessee have been damaged, and continue to be damaged, in a substantial amount to be proven at trial.

### Count IV (Using a False Record Statement Material to a False or Fraudulent Claim in Violation of Tennessee Code § 71-5-182(a)(1)(B))

126.    Relator re-alleges paragraphs 1-102 as if fully set forth herein.

127.    This is a claim for treble damages and civil penalties under the Tennessee FCA, Tenn. Code Ann. § 71-5-182(a)(1)(B).

128.    The Tennessee FCA makes it unlawful for any person to knowingly make or use a false record or statement that is material to a false or fraudulent claim.

129.    As set forth above, Caris admits and recertifies patients who are not appropriate for admission because they do not have a terminal illness (i.e.: a life expectancy of less than six months if the patient's illness runs its natural course).

130.    Between 40-50% of Caris' claims for payment to TennCare are false or fraudulent because the documentation supporting the certification that the patient has a terminal illness is

25

knowingly doctored or manipulated to paint a false picture that the patient is eligible and appropriate for hospice benefits.

131.     A prerequisite to receiving payment from TennCare for hospice benefits is that the patient be certified as having a terminal illness.  TennCare will not pay hospice benefits for a patient whose illness is not terminal.

132.     As set forth above, many of Caris' patients are falsely certified as having a terminal illness when, in fact, they do not have one.

133.     The United States and Tennessee, unaware of the false or fraudulent nature of these certifications, paid the claims submitted by Caris and would not have done so had it known the certifications were false.

134.     By reason of these payments, the United States and Tennessee have been damaged, and continues to be damaged, in a substantial amount to be proven at trial.

## Count V (Submission of False or Fraudulent Claims in Violation of Virginia Code § 8.01-216.3A.1.)

135.     Relator re-alleges paragraphs 1-102 as if fully set forth herein.

136.     This is a claim for treble damages and civil penalties under the Virginia FCA, Va. Code Ann. § 8.01-216.3A.1.

137.     The Virginia FCA makes it unlawful for any person to knowingly present a false or fraudulent claim for payment or approval.

138.     Caris submits monthly claims for payment to Virginia Medicaid for hospice services provided to patients who have elected to receive hospice care and chose Caris as the hospice provider.

139.     Between 40-50% of these claims are false or fraudulent because Caris knowingly admits and recertifies patients who are not appropriate for hospice services, as set forth above.

140.     The United States and Virginia, unaware of the false or fraudulent nature of these claims, paid the claims submitted by Caris and would not have done so had they known the patients were not eligible for hospice.

141.     By reason of these payments, the United States and Virginia have been damaged, and continue to be damaged, in a substantial amount to be proven at trial.

**Count VI (Using a False Record Statement Material to a False or Fraudulent Claim in Violation of Virginia Code § Va. Code Ann. § 8.01-216.3A.2)**

142.     Relator re-alleges paragraphs 1-102 as if fully set forth herein.

143.     This is a claim for treble damages and civil penalties under the Virginia FCA, Va. Code Ann. § 8.01-216.3A.1.

144.     The Virginia FCA makes it unlawful for any person to knowingly make or use a false record or statement that is material to a false or fraudulent claim.

145.     As set forth above, Caris admits and recertifies patients who are not appropriate for admission because they do not have a terminal illness (i.e.: a life expectancy of less than six months if the patient's illness runs its natural course).

146.     Between 40-50% of Caris' claims for payment to Virginia Medicaid are false or fraudulent because the documentation supporting the certification that the patient has a terminal illness is knowingly doctored or manipulated to paint a false picture that the patient is eligible and appropriate for hospice benefits.

147.     A prerequisite to receiving payment from Virginia Medicaid for hospice benefits is that the patient be certified as having a terminal illness.  Virginia Medicaid will not pay hospice benefits for a patient whose illness is not terminal.

148.     As set forth above, many of Caris' patients are falsely certified as having a terminal illness when, in fact, they do not have one.

27

149.     The United States and Virginia, unaware of the false or fraudulent nature of these certifications, paid the claims submitted by Caris and would not have done so had it known the certifications were false.

150.     By reason of these payments, the United States and Virginia have been damaged, and continues to be damaged, in a substantial amount to be proven at trial.

## PRAYER FOR RELIEF

*WHEREFORE, Relator prays that judgment be entered against Defendant, ordering that:*

1.     Defendant's assets be frozen until the final resolution of this action;

2.     Defendant cease and desist from violating the federal False Claim Act, 31 U.S.C. § 3729, *et seq.*, Tennessee FCA, Tenn. Code Ann. § 71-5-181, *et. seq.* and Virginia FCA, Va. Code Ann. § 8.01-216.1, *et. seq.*;

3.     Defendant pay the United States not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729 plus three times the amount of damages the United States has sustained because of Defendant's misconduct;

4.     Defendant pay the State of Tennessee not less than $5,000 and not more than $10,000 for each violation of Tenn. Code Ann. § 71-5-182(a) plus three times the amount of damages the State of Tennessee has sustained because of Defendant's misconduct;

5.     Defendant pay the state of Virginia not less than $5,500 and not more than $11,000 for each violation of Va. Code Ann. 8.01-216.3A. plus three times the amount of damages the state of Virginia has sustained because of Defendant's misconduct;

6.     Relator be awarded the maximum relator's share allowable pursuant to 31 U.S.C. § 3730(d), Tenn. Code Ann. § 71-5-183(d)(1), and Va. Code Ann. 8.01-216.7;

7.     Relator be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d), Tenn. Code Ann. § 71-5-183(d)(1), Va. Code Ann. 8.01-216.7, and any other applicable law or regulation;

8.     Defendant be enjoined from concealing, removing, encumbering, or disposing of assets which may be required to pay damages, penalties, fines, attorneys' fees and costs awarded by the Court; and

9.     The United States, Tennessee, Virginia, and Relator be awarded such other, further or different relief as the Court deems just and proper.

28

## JURY TRIAL DEMAND

RELATOR HEREBY DEMANDS TRIAL BY JURY.

/s/ Roland W. Riggs
Roland W. Riggs
Birt Reynolds
Milberg, LLP
One Pennsylvania Plaza
New York, NY 10119-0165
(212) 594-5300
rriggs@milberg.com
breynolds@milberg.com

*Lead Counsel for Relator*

/s/ Michael Hamilton
Michael Hamilton (TN Bar # 10720)
Provost Umphrey Law Firm, LLP
4205 Hillsboro Pike, Suite 303
Nashville, TN 37215
(615) 297-1932
mhamilton@pulf.com

*Local Counsel for Relator*