UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* HINKLE,<br><br>　　　　　　Plaintiff,<br><br>　　　v.<br><br>CARIS HEALTHCARE, L.P. and CARIS HEALTHCARE, LLC<br><br>　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 3:14-CV-212
Varlan/Guyton

## UNITED STATES' COMPLAINT IN INTERVENTION

The United States of America, by and through Nancy Stallard Harr, United States Attorney for the Eastern District of Tennessee, files this Complaint in Intervention against Defendants Caris Healthcare, L.P. and Caris Healthcare, LLC (collectively, "Caris" or "Defendants"). The United States alleges as follows:

## I.　Introduction

1.　Plaintiff, the United States of America, brings this action against Caris, a hospice provider, to recover losses sustained by the Medicare Program. Medicare is a federally-funded health care program, entitlement to which is based on age, disability, or affliction with end-stage renal disease. 42 U.S.C. §§ 426, 426-1. In addition to paying for doctor visits, nursing home care, and hospital stays, Medicare pays for what is known as hospice care for eligible Medicare beneficiaries.

2.　Caris is a for-profit chain of hospice providers. A significant portion of Caris's operating costs are funded through receipt of Medicare payments for claims that Caris submits

on behalf of individuals who Caris has represented to be eligible to receive Medicare hospice benefits.

3.    While elderly patients may qualify for a variety of other medical services paid for by Medicare, hospice companies like Caris are entitled to receive Medicare payments only for Medicare beneficiaries who are "terminally ill," meaning that that "the individual has a medical prognosis that his or her life expectancy is six months or less if the illness runs its normal course." 42 U.S.C. § 1395x(dd); 42 C.F.R. § 418.3. Medicare reimburses a provider for hospice care provided to terminally ill individuals that is "reasonable and necessary for the palliation or management of terminal illness[.]" 42 U.S.C. § 1395y(a)(1)(C).

4.    For a beneficiary to be eligible to elect Medicare hospice benefits, and for a hospice provider to be entitled to bill for such benefits, a beneficiary must, among other things, be certified as "terminally ill." 42 C.F.R. § 418.20; *see also* 42 U.S.C. § 1395f.  There are two principal components of the certification of eligibility.  The certification must: (1) be signed by at least one physician and (2) be accompanied by "[c]linical information and other documentation that support the medical prognosis" of terminal illness. 42 C.F.R. § 418.22(b)(2). A certification of eligibility must be obtained by a hospice provider when the patient is admitted to hospice, and subsequent certifications must be obtained periodically thereafter. *Id.* §§ 418.21 & 418.22.

5.    By electing the Medicare hospice benefit, Medicare beneficiaries waive all rights to Medicare payments for curative care and agree to forgo curative treatment for the terminal condition for which hospice care was elected.  42 C.F.R. § 418.24(d); *see also* 48 Fed. Reg. 56,008, 56,010 (Dec. 16, 1983).  Hospice providers provide palliative care designed to relieve the pain, symptoms, or stress of terminal illness. *See* 42 U.S.C. § 1395x(dd); 42 C.F.R. § 418.3.

2

Palliative care includes a comprehensive set of physical, psychosocial, emotional, and spiritual services. *See* 42 C.F.R. § 418.3.

6.     The United States alleges that Caris knowingly admitted and retained Medicare beneficiaries for hospice care who were not eligible to receive Medicare hospice benefits because they were not properly certified as "terminally ill," i.e., the clinical information and other documentation in the beneficiary's medical record did not support that the beneficiary had a life expectancy of six months or less. The United States alleges that Caris did so because it was financially lucrative—and that Caris continued to do so even after Caris was alerted to the ineligibility of a number of its patients. As a result, Caris improperly received millions of dollars from Medicare for beneficiaries who received hospice services while they were not hospice-eligible. Furthermore, even after Caris was made aware that it had billed for hospice services provided to individuals who were not hospice-eligible, Caris did not return the Medicare payments it had received.

7.     Specifically, the United States alleges that Caris is liable under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, because Caris submitted false and fraudulent claims to the United States for payment through the Medicare program from at least June 2013 through December 2013 and failed to return substantial amounts it was paid by Medicare for ineligible patients from at least April 2010 through June 2013.

## II.     Jurisdiction And Venue

8.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345, and supplemental jurisdiction to entertain common law or equitable claims pursuant to 28 U.S.C. § 1367(a).

3

9.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a).  Jurisdiction is proper over the Defendants because the Defendants maintain offices in and have transacted business within this Court's jurisdiction, and some of the acts in violation of 31 U.S.C. § 3729 occurred within this district.

10.     Venue is proper in this district under 28 U.S.C. §§ 1391(b)-(c), and 31 U.S.C. § 3732(a) because the Defendants maintain offices in and transact business in this district and because a substantial portion of the events or omissions giving rise to the claims alleged herein occurred in this district.

### III.    The Parties

11.     Plaintiff in this action is the United States of America, suing on behalf of the United States Department of Health & Human Services ("HHS") and its operating division, the Centers for Medicare & Medicaid Services ("CMS").  At all times relevant to this Complaint, CMS was an operating division of HHS that administered and supervised the Medicare Program.

12.     Caris is a for-profit business with approximately 26 locations in four states, including Tennessee, Virginia, South Carolina, and Missouri.  At all times relevant to the events described in this Complaint, Caris was engaged in the business of providing hospice care to patients who were terminally ill or whom Caris represented were terminally ill.  A substantial percentage of Caris's patients were Medicare beneficiaries.  Accordingly, Caris received a substantial percentage of its revenue from Medicare.

13.     Defendant Caris Healthcare, L.P., is a Tennessee partnership that is owned by Norman McCrae, an individual and the Chief Executive Officer ("CEO") of Caris, and National Healthcare Corporation ("NHC"), a publically traded company.  NHC has a partnership agreement and a substantial ownership interest in Caris Healthcare, L.P.

4

14.    Upon information and belief, Caris Healthcare, L.P., operates Caris's Tennessee and Virginia locations.

15.    Defendant Caris Healthcare, LLC is a South Carolina corporation, and, upon information and belief, is a subsidiary of Caris Healthcare, L.P., and operates Caris's South Carolina locations.

## IV.    The False Claims Act

16.    The False Claims Act provides, in pertinent part, that any person who

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

***

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government [for statutory damages and such penalties as are allowed by law].

31 U.S.C. § 3729(a)(1), (7) (2006), amended by 31 U.S.C. § 3729(a)(1)(A), (G).

17.    The False Claims Act further provides that "knowing" and "knowingly"

(A) mean that a person, with respect to information--
    (i)  has actual knowledge of the information;
    (ii) acts in deliberate ignorance of the truth or falsity of the information; or
    (iii) acts in reckless disregard of the truth or falsity of the information; and
(B) require no proof of specific intent to defraud.

31 U.S.C. § 3729(b) (2006), amended by 31 U.S.C. § 3729(b)(1).

## V.    The Medicare Program

18.    Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.*, establishes the Health Insurance for the Aged and Disabled Program, commonly referred to as the Medicare Program (the "Medicare Program" or "Medicare").

5

19. The Medicare Program is comprised of four parts. Part A of the Medicare Program is a federally-funded health care program, entitlement to which is based on age, disability, or affliction with end-stage renal disease. 42 U.S.C. §§ 426, 426-1. The benefits covered by Part A of the Medicare Program include hospice care under 42 U.S.C. §1395x(dd).

20. The United States provides reimbursement for Medicare claims from the Medicare Trust Funds through CMS. CMS, in turn, contracts with Medicare Administrative Contractors ("MACs"), formerly known as "fiscal intermediaries," to review, approve, and pay Medicare bills, called "claims," received from health care providers such as Caris. In this capacity, the MACs act on behalf of CMS.

21. Medicare payments are typically made directly to health care providers such as Caris rather than to beneficiaries. This occurs when the Medicare beneficiary assigns his or her right to payment to the provider. In that case, the provider submits its bill directly to Medicare for payment.

22. Hospice providers like Caris are reimbursed based upon their submission of an electronic claim form called an "837I," the standard format used by institutional providers to transmit health care claims electronically, or a hard-copy claim form called a "CMS-1450," also known as the UB-04. For purposes of this complaint, both the electronic claim form and the hard-copy claim form will be referred to as the "CMS-1450."

23. When a hospice provider submits a Medicare hospice claim, it represents that it is entitled to payment for the claim.

24. On the CMS-1450, the hospice provider must state, among other things, the beneficiary's name, the beneficiary's diagnosis, the beginning and ending dates of the period covered by the bill, and that the bill type is "hospice." *See* Medicare Claims Processing Manual,

6

Chap. 11, Processing Hospice Claims. By listing a diagnosis on the CMS-1450, the hospice provider implicitly represents that the beneficiary's diagnosis is a terminal one.

25.     By submitting the CMS-1450, the provider certifies that the billing information on the claim is true, accurate, and complete; that the provider did not knowingly or recklessly disregard or misrepresent or conceal material facts; that physician's certifications and re-certifications are on file; and that records adequately describing services will be maintained and necessary information will be furnished to such governmental agencies as required by applicable law.

26.     All healthcare providers, including Caris, must comply with applicable statutes, regulations and guidelines in order to be reimbursed by Medicare Part A.

27.     A provider has a duty to familiarize itself with the statutes, regulations and guidelines regarding coverage for the Medicare services it provides. *Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 64 (1984).

28.     Because it is not feasible for the Medicare program, or its contractors, to review every patient's medical records for the millions of claims for payment it receives from hospice providers, the Medicare program relies upon the hospice providers to comply with the Medicare requirements and trusts the providers to submit truthful and accurate claims. The Medicare program, through its contractors, also seeks to recoup payments made for improperly paid claims when such payments are identified. This includes payments made to providers for claims submitted on behalf of beneficiaries ineligible for the hospice benefit because they were not properly certified as "terminally ill."

7

## VI.    Applicable Requirements

29.    Hospice is a program to provide what is called palliative care to patients instead of curative care. Palliative care is aimed at relieving pain, symptoms, or stress of terminal illness. *See* 42 C.F.R. § 418.3. It includes a comprehensive set of medical, social, psychological, emotional, and spiritual services provided to a terminally ill individual. *See id.* Medicare beneficiaries who elect hospice care agree to forego curative treatment for the terminal condition for which hospice care was elected. 42 C.F.R. § 418.24(d); *see also* 48 Fed. Reg. 56,008, 56,010 (Dec. 16, 1983). In other words, patients who receive the Medicare hospice benefit no longer receive care that could lead to a cure of their illnesses.

30.    Pursuant to 42 C.F.R. § 418.20, to be eligible to elect hospice care under Medicare, an individual must be—(a) entitled to Part A of Medicare; and (b) certified as terminally ill in accordance with 42 C.F.R. § 418.22.

31.    According to 42 C.F.R. § 418.3, "terminally ill" means that a person "has a medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal course."

32.    At all times relevant to this case, each written certification required: (1) a statement that the individual's medical prognosis is that his or her life expectancy is six months or less if the terminal illness runs its normal course; (2) specific clinical findings and other documentation supporting a life expectancy of six months or less; (3) the signature(s) of the physician(s); and (4) the physician's brief narrative explanation of the clinical findings that support the individual's life expectancy of six months or less. 42 C.F.R. § 418.22; Medicare Benefit Policy Manual, Chapter 9, § 20.1.

8

33. Thus, as part of the certification requirements, the hospice must not only ensure that it has a certification on file signed by a physician but also must ensure that the medical record that the hospice maintains for the individual contains clinical information and other documentation that support that the individual is "terminally ill." *See* 42 U.S.C. § 1395f(a)(7); 42 C.F.R. § 418.22.

34. Hospice is available to individuals for two initial 90-day periods and then an unlimited number of 60-day periods, provided the individual's terminal condition is properly certified generally at the beginning of each period. 42 U.S.C. § 1395d(a)(4); *see also* 42 C.F.R. § 418.21, 418.22.

35. The initial 90-day period must be certified by (a) the Medical Director of the hospice or a physician-member of the hospice interdisciplinary group and (b) the individual's attending physician, if the individual has an attending physician. For subsequent periods, the hospice provider must obtain the certification of terminal illness from either the medical director of the hospice or a physician who is a member of the hospice's interdisciplinary group. *See* 42 U.S.C. § 1395f(a)(7)(A); 42 C.F.R. § 418.22(c).

36. Hospice care is paid at a per diem rate based on the number of days and level of care provided during the election period. Medicare Benefit Policy Manual, Chapter 9, § 40; *see also* 42 C.F.R. § 418.302.

37. Hospice providers must maintain a clinical record for each hospice patient that contains "correct clinical information." 42 C.F.R. § 418.104. All entries in the clinical record must be "legible, clear, complete, and appropriately authenticated and dated . . . ." *Id.* at § 418.104.

9

38.	While physicians certainly are expected to prescribe only necessary services, to ensure the integrity of the Medicare hospice program, payment for hospice services requires supporting medical information.  For this reason, clinical information in the patient's medical record supporting a life expectancy of six months or less is a condition of payment for hospice care separate and independent of a signed physician certification. 42 C.F.R. § 418.22; 42 C.F.R. § 418.200; *see also* 79 Fed. Reg. 50,452, 50,470 (Aug. 22, 2014); 78 Fed. Reg. 48,234-01, 48,245 (Aug. 7, 2013); 74 Fed. Reg. 39,384-01, 39,398 (Aug. 6, 2009); 70 Fed. Reg. 70,532, 70,534-35 (Nov. 22, 2005).  Conditioning payment for hospice services on clinical information demonstrating that the patient is terminally ill constitutes an important safeguard to ensure that scarce hospice benefits are made available to those who truly need them.

39.	These important Medicare requirements for coverage of hospice care and submission of hospice claims are communicated to hospice providers in the Medicare statute and regulations; the Medicare Benefit Policy Manual, Chapter 9; the Medicare Claims Processing Manual, Chapter 11; the Federal Register; and in other published guidance.

40.	Upon enrollment as a Medicare provider, a provider agrees "to abide by the Medicare laws, regulations and program instructions [applicable to it]" and acknowledges that "payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions . . . ." CMS-855A, § 15.

## VII.	Determining Life Expectancy

41.	Clinical indicators of a life expectancy of six months or less are set forth in multiple public sources, including Hospice Local Coverage Determinations ("LCDs") issued by MACs.  MACs develop LCDs by "considering medical literature, the advice of local medical

10

societies and medical consultants, public comments, and comments from the provider community." Medicare Program Integrity Manual, Chapter 13, § 13.1.3.

42.     Palmetto GBA, LLC ("Palmetto") is the MAC responsible for processing claims submitted by Caris for payment by the Medicare program. Palmetto has issued LCDs that set forth medical criteria for determining whether individuals with certain diagnoses have life expectancies of six months or less.

43.     CMS has instructed hospice providers to use LCDs and other clinical tools to determine whether a Medicare beneficiary, based on his or her current clinical status and the anticipated progression of his or her illness, has a prognosis of six months or less. *See* 78 Fed. Reg. 48234, 48247 (Aug. 7, 2013); 79 Fed. Reg. 26538, 26556 (May 8, 2014).

44.     Caris was aware of the relevance of the LCDs in determining whether a Medicare beneficiary was eligible for hospice services.

45.     Some diagnoses, like certain cancers, have an inherent prognosis of a life expectancy of six months or less.

46.     Other diagnoses, like Alzheimer's disease, dementia, and debility, do not automatically support that a patient has a life expectancy of six months or less, as patients with such diagnoses may have a life expectancy of years before signs and symptoms of advanced disease are present. Without the knowledgeable application of clinical research and guidelines, hospices are at risk of admitting and keeping patients who do not have life expectancies of six months or less.

47.     For example, individuals live for, on average, eight to ten years after diagnosis with Alzheimer's disease. Some live 20 years or more. *See* Mayo Clinic, Alzheimer's Stages: How the Disease Progresses, available at http://www.mayoclinic.org/diseases-

11

conditions/alzheimers-disease/in-depth/alzheimers-stages/ART-20048448?pg=2. LCDs and other clinical publications help identify which Alzheimer's patients are clinically likely to have a life expectancy of six months or less. *See, e.g.*, Palmetto GBA's Local Coverage Determination for Hospice Alzheimer's Disease & Related Disorders (L31539); National Institutes on Aging, Alzheimer's disease and end of life issues, August 1, 2003 (updated December 8, 2011), available at http://www.nia.nih.gov/print/alzheimers/features/alzheimers-disease-and-end-life-issues; Tsai S, Arnold R., Fast Facts and Concepts #150, *Prognostication in Dementia*, February 2006 (updated April 2009), available at http://www.mypcnow.org/blank-txv87.

48.     Similar guidance exists to help identify patients with other diagnoses who are clinically likely to have life expectancies of six months or less.

49.     In 2013, CMS issued guidance that debility and adult failure to thrive should no longer be used as principal hospice diagnoses because these diagnoses "are incongruous to the comprehensive nature of the hospice assessment, the specific, individualized hospice plan of . . . care, and the hospice services provided." 78 Fed. Reg. 27823, 27832 (May 10, 2013).

50.     CMS also has instructed hospice providers that an individual should be considered for discharge from the Medicare hospice benefit if he or she improves or stabilizes sufficiently over time while on hospice, such that he or she no longer has a life expectancy of six months or less. *See* 75 Fed. Reg. 70372, 70448 (Nov. 17, 2010).

12

## VIII. Factual Allegations

### A. Caris's business practices encouraged the admission and retention of ineligible Medicare beneficiaries.

51. Caris personnel operate from approximately twenty-six Caris office locations in four states and provide hospice care to patients at various nursing and assisted living facilities, as well as in patients' homes.

52. Caris tightly controlled the financials of all of its locations and set aggressive targets for the number of patients to be admitted to hospice care and the number of patients to remain on hospice care at any one time (referred to as "census targets").

53. Caris set high expectations for its employees regarding the number of admissions and census targets, and it pressured its employees to meet these targets, including by tracking financial goals on a daily, weekly, monthly, quarterly and annual basis.

54. According to Caris's business materials, "Caris tracks and evaluates [Average Daily Census] levels at all offices daily, holding Administrators and Caris Representatives accountable for continuing growth."

55. Caris's employees were financially incentivized to meet these admissions and census targets and were eligible for bonuses based on these metrics.

56. Caris utilized bonus programs available to branch administrators, nursing supervisors, and sales and marketing representatives based on admissions and census.

57. Factors used to determine bonus eligibility and amounts were the number of admissions and patient census.

58. Caris's quarterly bonus system allowed Sales & Marketing Representatives to make higher wages than the Caris medical staff.

13

59.     In order to meet Caris's aggressive admissions and census targets, Caris's

personnel felt pressure to admit or recommend admission of ineligible patients.

**B.     Caris prioritized admissions and retention over all other considerations, including whether or not the patient was eligible for Medicare hospice benefits.**

60.     Notwithstanding Medicare's requirement that certification of terminal illness for

hospice benefits shall be based on the clinical judgment of the hospice medical director or

physician member of the interdisciplinary group (IDG) and the individual's attending physician,

if he/she has one, and shall be accompanied by supporting clinical information and other

documentation, *see* 42 U.S.C. § 1395f(a)(7); 42 C.F.R. § 418.22, Caris established a business

model that allowed admission nurses rather than physicians to make the initial determination of a

patient's eligibility for hospice care.

61.     Caris's medical directors received little, if any, compliance or eligibility training

when beginning employment with Caris.

62.     Medical directors at Caris facilities frequently signed certifications and

re-certifications without examining the patient and often only after a cursory review, if any, of

patient medical records.

63.     After joining Caris in 2013, the Chief Medical Officer ("CMO") recognized that

medical directors had not received sufficient training on hospice eligibility and were not aware of

many of the Medicare requirements as it related to hospice care.

64.     A part of the nurses' responsibilities at Caris was to screen potential new hospice

patients for eligibility and admission.  After seeing a patient, Caris nurses input their notes into

an electronic medical records system.

14

65. Given that medical directors typically did not examine patients, medical directors relied almost entirely on nurses' notes and nurses' oral statements about patients' conditions.

66. Caris nurses were instructed to "chart negatively" (i.e., include and emphasize in a patient's medical records information supporting hospice eligibility, such as any evidence of decline in the patient's medical condition) and, in some instances, were instructed to omit notes regarding patient improvement.

67. At times, Caris administrators accessed nurses' notes in the patients' medical records before they were finalized and changed them to sound more negative.

68. Instances also occurred in which nurses, after seeing a patient, personally recommended against admission because they believed a patient was not eligible for hospice, but the patient was admitted nonetheless. Caris administrators had directed other nurses to re-examine the patient until one of the nurses recommended admission.

69. For example, in December 2013, a Patient Care Manager at the Johnson City, Tennessee facility wrote a letter detailing concerns to Caris's CEO (with copies provided to the Regional Director of Operations and the Chief Compliance Officer). The letter specifically referenced one patient who was not admitted initially due to lack of eligibility, but after three separate evaluations, the patient was admitted. The Chief Compliance Officer agreed that the patient did "not have a clear reason for admission."

70. Caris terminated nurses for refusing to admit patients that they believed were ineligible for hospice care.

71. For example, one nurse was terminated by Caris for refusing to admit a particular patient for hospice services when that nurse's examination of the patient revealed that the patient was not terminally ill. The nurse informed the administrator that the patient was not eligible for

15

hospice services based on the patient's medical condition, and the administrator became irate that the nurse had refused to admit the patient to hospice services. The next day, the administrator informed the nurse that the patient had been admitted, and upon review of the patient's medical chart, the nurse found that it had been falsified with health problems that were fictitious. Two days later, the nurse's employment with Caris was terminated.

72.     Caris also terminated a medical director who refused to certify a patient for hospice services. The medical director directed nursing staff to prepare a discharge plan for a patient who did not qualify for hospice care. However, the patient was not discharged, and when the medical director inquired as to why, the medical director was informed that all discharges were determined by the administrator even though the administrator was not a physician. The medical director reported this incident to Caris management, and less than a month later, she was terminated.

C.     **By at least June 2013, Caris knew, or should have known, it had received millions of dollars in overpayments from Medicare for the care of beneficiaries who were ineligible for hospice benefits.**

1.     Caris's June 2013 internal audit reflected lack of support for hospice eligibility for a significant percentage of the audited Medicare patients.

73.     Caris conducted an internal audit in June 2013 of forty-five (45) patients who were on hospice service at the time of the audit and who had been on hospice service for one year or more.

74.     The 45 audit patients had been treated at 16 different Caris facilities (7 facilities from Caris's East Region and 9 facilities from Caris's West Region).

75.     The audit was performed as a one-month snapshot review and evaluated the patients' April 2013 medical records.

76.     The medical reviewer found that "hospice eligibility and limited prognosis was not supportable" for 38 percent of the patients (17 out of 45 patients).

77.     For another 18 percent of the patients, the medical reviewer found that "the documentation partially met LCD guidelines, [but] hospice eligibility and limited prognosis was questionable due to a lack of documented symptomatic secondary and/or comorbid conditions" (8 out of 45 patients).  For those with questionable eligibility, the audit stated that the records for the patients reflected chronic, not terminal, conditions.

78.     The results of this audit suggest that between 38 percent and 56 percent of the audited patients were not eligible for hospice services as of April 2013.

79.     Yet, Caris continued to bill Medicare for nearly all of these patients even after it received the results of the audit.

80.     In addition, Caris did not repay to Medicare any of the amounts received (either pre-audit or post-audit) for the patients whose eligibility was determined to be either not supported or questionable.  Caris was paid nearly $6 million for just these patients during the pre- and post-audit time period.

81.     Based on the internal audit it conducted in June 2013, Caris knew, or should have known, that its medical records frequently did not support Medicare reimbursement and that this problem was corporate-wide and not limited to only a few of its branch offices.  Accordingly, by June 2013, Caris knew, or should have known, that it had received and retained overpayments from Medicare for ineligible hospice services for a substantial number of beneficiaries beyond those specifically examined in the internal audit.

17

### 2. Caris received explicit advice in 2013 that it had a problem with Medicare beneficiary eligibility.

82. As described above, the Medicare program only provides hospice benefits for Medicare beneficiaries who are "terminally ill," which are individuals with a medical prognosis with an associated life expectancy of six months or less. Given the expense associated with hospice care, this prerequisite ensures that limited Medicare funds are properly spent on patients whose death is relatively imminent and who actually need hospice services.

83. In 2013, Caris's CEO hired a new Chief Medical Officer (CMO). During her time at Caris, this new CMO heard about many patients on service with Caris who were not terminally ill. During interdisciplinary team meetings, the CMO raised her concerns regarding the lack of hospice eligibility, which was evidenced by patients' long lengths of stay and the CMO's conversations with Caris personnel. The CMO met resistance from other members of the interdisciplinary team who were focused on keeping patients on service instead of examining their ineligibility.

84. The CMO reported her concerns to several members of Caris's management, including the Clinical Operations Manager, the Chief Compliance Officer, the Regional Director of Clinical Care for East Tennessee and Virginia, and the CEO. The CMO also expressed concerns directly to members of various interdisciplinary teams at the local level, including several medical directors.

85. For example, in October 2013, the CMO informed the CEO, the Chief Compliance Officer, the Executive Vice President of Finance, Accounting, Sales, and Marketing, and the Vice President of Patient Care via email that she was "struck by the many patients on [service] for long periods" and that she "would like to speak [with them] more about it."

18

86.     In December 2013, the CMO again informed the CEO, the Chief Compliance

Officer, the Executive Vice President of Finance, Accounting, Sales, and Marketing, and the

Vice President of Patient Care via email of her concerns.  The CMO reported an incident

involving a medical director who was "trying to get [patients discharged] … for quite some

time," but noted that the medical director was "getting a lot of pushback [about] this to the point

where she said she does not know what action to take."  According to the CMO, the medical

director "actually said she has written narratives about the [patient] not being eligible and the

administrator/PCM/RDCC have still decided to keep the [patient] on service."  The CMO went

on to state that this type of pushback was something several medical directors were experiencing.

87.     The CMO also suggested that Caris should conduct additional length of stay

audits beyond the June 2013 "snapshot" audit discussed above, but the government has no

evidence that any such additional audits were conducted between June 2013 and December 2013.

88.     Caris's senior management (including the CEO, the Chief Compliance Officer,

the Executive Vice President of Finance, Accounting, Sales, and Marketing, and the Vice

President of Patient Care) did not address the CMO's concerns to her satisfaction, and the CMO

resigned from Caris in December 2013.

89.     In spite of the warnings and red flags raised by Caris's auditors and staff, Caris

continued to admit and retain patients who were not eligible for Medicare hospice benefits.

**D.     Caris knowingly failed to return to the government overpayments it had
         received from Medicare for the care of ineligible hospice beneficiaries
         between at least April 2010 and June 2013.**

90.     The Affordable Care Act ("ACA"), enacted on March 23, 2010, requires a person

who has received an overpayment to report and return the overpayment to the government and to

notify the government in writing of the reason for the overpayment. 42 U.S.C. § 1320a-7k(d)(1).

19

Providers such as Caris must report and return overpayments within 60 days after the date on which the overpayment was identified. *Id.* § 1320a-7k(d)(2).

91.     The ACA specifies that any overpayment retained by a person after the deadline for reporting and returning an overpayment is an "obligation" as defined in 31 U.S.C. § 3729(b)(3) for purposes of False Claims Act liability. 42 U.S.C. § 1320a-7k(d)(3). The requirements in this rule are meant to ensure compliance with applicable statutes, promote the furnishing of high quality care, and to protect the Medicare Trust Funds against fraud and improper payments.

92.     By June 2013, Caris knew, or should have known, that many of its patients' medical records did not support the patients' terminally ill status and, thus, that it had filed Medicare hospice claims for patients not eligible for hospice services between April 2010 and June 2013.

93.     Given that Caris was not entitled to receive reimbursement for the care of ineligible patients, the payments that Caris received for such patients constituted overpayments that Caris was obligated to report and return.

94.     Despite this information, Caris did not report these overpayments and did not repay Medicare for amounts billed for audit patients whose hospice eligibility was found to be either questionable or not supportable. Upon information and belief, Caris also did not report overpayments or repay Medicare for amounts billed for other hospice patients treated during the period April 2010 through June 2013 who were not eligible for hospice services.

20

**E.   Caris knowingly submitted false claims to Medicare on behalf of ineligible hospice beneficiaries from at least June 2013 through December 2013.**

95.     By June 2013, through the results of the June 2013 audit and concerns expressed by its new CMO, Caris had been put on notice that it had been submitting claims for a number of identifiable Medicare beneficiaries who were not properly certified as terminally ill and, thus, ineligible for the hospice benefit, and that it was likely Caris was submitting claims for ineligible hospice beneficiaries beyond those specifically identified.

96.     Yet, despite these warnings, Caris continued to submit claims for patients identified in the audit as patients whose hospice eligibility was either "not supportable" or "questionable." Upon information and belief, Caris also knowingly submitted false claims for other Medicare beneficiaries who were not properly certified as terminally ill because their medical records did not contain clinical information and other documentation supporting a terminal prognosis.

97.     When Caris enrolled in the Medicare program, it expressly agreed "to abide by the Medicare laws, regulations and program instructions [applicable to it]" and acknowledged that "payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions . . . ." CMS-855A, § 15. Any hospice claim Caris submitted on behalf of a beneficiary in which the certification of eligibility did not contain both a physician signature and clinical information and other documentation supporting a prognosis of six months or less violated this express agreement and therefore was a false claim.

98.     In addition, when Caris submitted hospice claims to Medicare, it included the beneficiaries' diagnoses on the CMS-1450s, as required. By including a diagnosis on the CMS-

21

1450 for a hospice claim, Caris implicitly represented to Medicare that the beneficiary's stated diagnosis was a terminal one. *See* Medicare Claims Processing Manual, Chap. 11, Processing Hospice Claims. For those beneficiaries for whom clinical information and other documentation in the beneficiary's medical record did support that the beneficiary was "terminally ill," Caris failed to disclose that critical information to Medicare. This failure made Caris's statement to Medicare on the CMS-1450 of the beneficiary's (supposedly terminal) diagnosis misleading in context.

99. Further, by submitting hospice claims to Medicare, Caris implicitly represented that it had the required physician certifications or re-certifications on file (including both a physician signature and clinical information and other documentation to support the terminal prognosis in the patients' medical records), as required by Federal regulations. *See* 42 U.S.C. § 1395f(a)(7); 42 C.F.R. § 418.22. For any beneficiary for whom Caris knew or should have known it did not have both the physician signature and clinical information and other documentation to support that the beneficiary was "terminally ill," Caris's submission of hospice claims on behalf of that beneficiary was false.

100. For the reasons discussed above, Caris knew or should have known that claims it submitted to Medicare for non-terminally ill patients, and thus ineligible beneficiaries, from at least June 2013 through December 2013 were false.

## IX. The Materiality of the Physician Certification Requirement

101. For each hospice claim Caris submitted to Medicare for payment, Caris was required to maintain on file the physician certifications and re-certifications of the patient's status as "terminally ill," as required by Federal regulations. Federal regulations required that such physician certifications and re-certifications include the presence of clinical information

22

and other documentation in the medical record that support the patient's status as "terminally ill." *See* 42 U.S.C. § 1395f(a)(7); 42 C.F.R. § 418.22.

102. The physician certifications and re-certifications of terminal illness (including supporting documentation) that Caris was required to maintain on file were material to the government's decision to pay Caris's hospice claims. *See* 31 U.S.C. § 3729(a)(4) (defining "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property").

103. The presence of physician certifications and re-certifications of terminal illness (each of which includes a representation that clinical information in the patient's medical record supports a life expectancy of six months or less) is so central to the hospice benefit that it is expressly designated as a condition of payment for hospice care. 42 U.S.C. § 1395f(a)(7); 42 C.F.R. § 418.22; 42 C.F.R. § 418.200; *see also* 79 Fed. Reg. 50,452, 50,470 (Aug. 22, 2014); 78 Fed. Reg. 48,234-01, 48,245 (Aug. 7, 2013); 74 Fed. Reg. 39,384-01, 39,398 (Aug. 6, 2009); 70 Fed. Reg. 70,532, 70,534-35 (Nov. 22, 2005).

104. There are statutes, regulations, and publicly available guidance and other documents from HHS, CMS, and Palmetto emphasizing that a patient is eligible for the hospice benefit (and thus payment will be made for hospice services provided to that patient) only when the patient is certified as being "terminally ill," which includes the requirement that clinical information and other documentation in the patient's medical record supports the patient's terminal status. *See, e.g.*, 42 U.S.C. § 1395f(a)(7); 42 C.F.R. §§ 418.20, 418.22, 418.200; 79 Fed. Reg. 50,452, 50,470 (Aug. 22, 2014); 78 Fed. Reg. 48,234-01, 48,245 (Aug. 7 2013); 74 Fed. Reg. 39,384-01, 39,398 (Aug. 6, 2009); 70 Fed. Reg. 70,532, 70,534-35 (Nov. 22, 2005);

23

Medicare Benefit Policy Manual, Chap. 9, § 10. Far from being minor or insubstantial, the physician certification requirements go to the very core of the hospice benefit.

105. Caris engaged in systemic and pervasive violations of the physician certification requirements. Caris's violations occurred with respect to multiple patients over a period of years. Caris's violations were not isolated to one facility or one medical professional. Moreover, they were not *de minimis* violations of technical requirements tangential to the hospice benefit but, rather, were violations that relate to the very foundation of hospice eligibility.

106. The government routinely denies payment for hospice services, or seeks to recoup payments already made, when clinical information and other documentation in a beneficiary's medical record does not support that the beneficiary is terminally ill. For example:

(a) The United States Department of Justice ("DOJ") has settled approximately two dozen *qui tam* actions in which it was alleged that a hospice provider was submitting claims for patients who were not eligible for hospice services because clinical information and other documentation in the patients' medical records did not support that they had life expectancies of six months or less at the start of each certification period; and DOJ has issued press releases about the settlements. *See, e.g.,* SouthernCare, Inc. Settlement Press Release (January 15, 2009), *available at* https://www.justice.gov/archive/opa/pr/2009/January/09-civ-043.html

(b) DOJ also has intervened in several *qui tam* actions in which it was alleged that a hospice provider was submitting claims for patients who were not eligible for hospice services because clinical information and other documentation in the patients' medical records did not support that they had life expectancies of six months or less

24

at the start of each certification period. *See, e.g., United States ex rel. Landis v. Hospice Care of Kansas, Inc., et al.*, No. 06-2455-CM (D. Kan.) (notice of election to intervene filed February 26, 2010); *United States v. AseraCare, Inc.*, No. 2:12-cv-245 (N.D. Ala.) (motion to intervene filed February 20, 2012); *United States v. Vitas Hospice Services, L.L.C.*, No. 13-0449-CV-W-BCW (W.D. Mo) (intervention documents filed May 9 & 10, 2013).

(c) Moreover, DOJ has intervened in the present *qui tam* action in which relator alleged that Caris submitted claims for patients who were not eligible for hospice services because clinical information and other documentation in the patients' medical records did not support that they had life expectancies of six months or less at the start of each certification period. *See* Dkt. 46.

107. Accordingly, a reasonable person would know that the government would not pay hospice claims submitted to Medicare if it knew that the beneficiary for whom the claim was submitted did not have a prognosis of being "terminally ill" (i.e., did not have a life expectancy of six months or less) or knew that the clinical information and other documentation in the beneficiary's medical record did not support that the beneficiary was terminally ill.

108. In addition, Caris itself had actual knowledge of the importance the government attached to the physician certification requirement for hospice claims. For example:

(a) Caris had a duty to be knowledgeable about the relevant hospice regulations. These regulations made clear that a patient's certified "terminal illness" (as supported by medical record documentation) was a core requirement of eligibility for Medicare's hospice benefit.

25

(b) Upon enrollment as a Medicare provider, Caris agreed "to abide by the Medicare laws, regulations and program instructions [applicable to it]" and acknowledged that "payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions." CMS-855A, § 15.

(c) In 2011, one of Caris's outside auditors informed Caris that Palmetto would likely deny payment for claims submitted on behalf of patients whose eligibility for hospice was questionable or whose clinical records did not contain sufficient documentation to support clinical eligibility.

(d) In June 2013, Caris conducted an internal audit of forty-five (45) hospice patients who had been on service for over one year to assess whether the patients were eligible for hospice services in order to "minimize the risk of non-compliance and/or non-payment."

(e) Caris hired Sylvia Singleton as an Internal Auditor in November 2012 and promoted her to Chief Compliance Officer in August 2013. Prior to working for Caris, Ms. Singleton had been Manager of Medical Reviews at Palmetto for nearly ten years and thus was acutely aware of the importance Medicare attached to terminally ill certifications for hospice patients, including that Medicare would deny payment (or seek to recoup payments already made) for hospice claims submitted for the care of patients for whom clinical information and other documentation in their medical records did not support the patients' statuses as "terminally ill."

26

## X. Examples of Medicare Beneficiaries Caris Knew, Or Should Have Known, Were Not Eligible for Medicare Hospice Benefits

109. As described above, in June 2013, a Caris auditor reviewed forty-five patient charts and determined that between 38 percent and 56 percent of these audit patients were not eligible for hospice services as of April 2013.

### A. Audit Sample Patient 1

110. Patient 1 was admitted to hospice by Caris in October 2009 at Caris's Dickson facility, purportedly for "adult failure to thrive."

111. The diagnosis of "adult failure to thrive" can be end-stage if (a) the nutritional impairment associated with the patient's condition is severe enough to impact the patient's weight, i.e., results in progressive weight loss, and (b) the disability associated with the patient's condition is such that the patient is significantly disabled. *See, e.g.*, Palmetto GBA's Local Coverage Determination for Hospice The Adult Failure to Thrive Syndrome (L31541).

112. As of April 2013, Patient 1 had been on hospice with Caris for 1,283 days (over three-and-a half years). Based on the auditor's "snapshot" review, the auditor determined that Patient 1's hospice eligibility and limited prognosis was not supportable because, *inter alia*, since her October 2009 hospice admission, Patient 1's weight had remained relatively stable and Patient 1 had maintained the same Palliative Performance Scale ("PPS") score of 40%, indicating no decline in functional ability. For these reasons, the Caris auditor found that the patient's condition as reflected in the documentation submitted for review for Patient 1 was insufficient to support hospice eligibility during the April 2013 time period.

27

113.    Caris submitted the following claims to Medicare for Patient 1 and received the following payments:

| From Date | Through Date | Paid Date | Amount Billed | Amount Paid |
|-----------|--------------|-----------|---------------|-------------|
| 10/26/09 | 10/31/09 | 11/30/09 | $1,639.32 | $859.35 |
| 11/01/09 | 11/30/09 | 12/28/09 | $6,176.60 | $4,296.73 |
| 12/01/09 | 12/31/09 | 01/20/10 | $6,699.82 | $4,439.95 |
| 01/01/10 | 01/31/10 | 02/19/10 | $6,154.82 | $4,439.95 |
| 01/01/10 | 01/31/10 | 07/25/11 | ($6,154.82) | ($4,439.95) |
| 02/01/10 | 02/28/10 | 03/17/10 | $6,800.16 | $4,010.28 |
| 02/01/10 | 02/28/10 | 07/25/11 | ($6,800.16) | ($4,010.28) |
| 03/01/10 | 03/31/10 | 04/19/10 | $10,371.28 | $5,921.41 |
| 03/01/10 | 03/31/10 | 07/25/11 | ($10,371.28) | ($5,921.41) |
| 04/01/10 | 04/30/10 | 05/28/10 | $7,571.60 | $4,296.73 |
| 04/01/10 | 04/30/10 | 07/25/11 | ($7,571.60) | ($4,296.73) |
| 05/01/10 | 05/31/10 | 06/21/10 | $7,569.82 | $4,439.95 |
| 06/01/10 | 06/30/10 | 07/19/10 | $8,156.60 | $4,296.73 |
| 07/01/10 | 07/31/10 | 08/18/10 | $7,539.82 | $4,439.95 |
| 08/01/10 | 08/31/10 | 09/23/10 | $7,744.82 | $4,439.95 |
| 09/01/10 | 09/30/10 | 10/19/10 | $8,111.60 | $4,296.73 |
| 10/01/10 | 10/31/10 | 11/24/10 | $7,051.72 | $4,585.82 |
| 11/01/10 | 11/30/10 | 12/16/10 | $7,143.60 | $4,437.89 |
| 12/01/10 | 12/31/10 | 01/18/11 | $7,411.72 | $4,585.82 |
| 01/01/11 | 01/31/11 | 02/16/11 | $7,079.83 | $4,585.82 |
| 02/01/11 | 02/28/11 | 03/24/11 | $6,682.04 | $4,142.03 |
| 03/01/11 | 03/31/11 | 04/18/11 | $7,865.83 | $4,585.82 |
| 04/01/11 | 04/30/11 | 05/23/11 | $7,352.90 | $4,437.89 |
| 05/01/11 | 05/31/11 | 06/17/11 | $16,892.32 | $11,212.26 |
| 06/01/11 | 06/30/11 | 07/20/11 | $7,406.90 | $4,437.89 |
| 07/01/11 | 07/31/11 | 08/16/11 | $8,005.83 | $4,585.82 |
| 08/01/11 | 09/30/11 | 10/18/11 | $16,103.23 | $9,023.71 |
| 10/01/11 | 10/31/11 | 12/05/11 | $7,829.04 | $4,614.05 |
| 11/01/11 | 11/30/11 | 12/16/11 | $7,520.20 | $4,465.21 |
| 12/01/11 | 12/31/11 | 01/19/12 | $8,252.97 | $5,127.98 |
| 01/01/12 | 01/31/12 | 02/16/12 | $7,549.04 | $4,614.05 |
| 01/01/12 | 01/31/12 | 02/10/12 | $7,549.04 | $0.00 |
| 02/01/12 | 02/29/12 | 03/22/12 | $6,696.36 | $4,316.37 |
| 03/01/12 | 03/31/12 | 04/17/12 | $6,689.04 | $4,614.05 |
| 04/01/12 | 04/30/12 | 05/16/12 | $7,405.20 | $4,465.21 |

28

| | | | | |
|---|---|---|---|---|
| 05/01/12 | 05/31/12 | 06/15/12 | $7,474.04 | $4,614.05 |
| 06/01/12 | 06/30/12 | 07/17/12 | $6,680.20 | $4,465.21 |
| 07/01/12 | 07/31/12 | 08/16/12 | $7,314.04 | $4,614.05 |
| 08/01/12 | 08/31/12 | 09/19/12 | $7,334.04 | $4,614.05 |
| 09/01/12 | 09/30/12 | 10/18/12 | $7,375.20 | $4,465.21 |
| 10/01/12 | 10/31/12 | 11/19/12 | $8,014.27 | $4,624.24 |
| 11/01/12 | 11/30/12 | 12/18/12 | $7,065.10 | $4,475.07 |
| 12/01/12 | 12/31/12 | 01/17/13 | $7,014.27 | $4,624.24 |
| 01/01/13 | 01/31/13 | 02/15/13 | $7,124.27 | $4,624.24 |
| 02/01/13 | 02/28/13 | 03/19/13 | $6,196.76 | $4,176.74 |
| 03/01/13 | 03/31/13 | 04/17/13 | $6,939.27 | $4,624.24 |
| 04/01/13 | 04/30/13 | 05/17/13 | $7,245.10 | $4,385.57 |
| 05/01/13 | 05/31/13 | 06/19/13 | $7,279.27 | $4,531.76 |
| 06/01/13 | 06/30/13 | 07/17/13 | $7,080.10 | $4,385.57 |
| 07/01/13 | 07/31/13 | 08/19/13 | $7,709.27 | $4,531.76 |
| 08/01/13 | 08/31/13 | 09/19/13 | $11,292.67 | $7,058.59 |
| 09/01/13 | 09/30/13 | 10/16/13 | $7,030.10 | $4,385.57 |
| 10/01/13 | 10/31/13 | 11/18/13 | $6,966.18 | $4,489.62 |
| 11/01/13 | 11/30/13 | 12/17/13 | $6,653.40 | $4,344.79 |
| 12/01/13 | 12/04/13 | 01/21/14 | $1,941.12 | $579.31 |
| **Totals** | | | **$353,853.88** | **$212,960.91** |

114.     Despite the auditor's finding in June 2013 that Patient 1 was ineligible for hospice benefits in April 2013, Caris did not return any of the payments it received for Patient 1 for claims submitted based on the physician certification(s) that covered the April 2013 time period (i.e., the claims submitted for the months April, May, and June 2013).

115.     Upon information and belief, Caris also did not undertake adequate due diligence of Patient 1's medical records and certifications to determine whether Patient 1 had been hospice-eligible before April 2013 and, if not, whether it had an obligation to return overpayments it had received from Medicare for services rendered prior to April 2013. Therefore, upon information and belief, Caris knowingly retained overpayments related to some or all of the claims Caris submitted for Patient 1 prior to April 2013.

29

116.     In addition, despite the auditor's finding in June 2013 that Patient 1 was ineligible for hospice benefits in April 2013, Caris continued to submit claims for Patient 1 in and after June 2013.  Yet, upon information and belief, Caris did not monitor or reevaluate Patient 1 to determine whether Patient 1 was hospice-eligible in and after June 2013.  Therefore, upon information and belief, Caris knowingly submitted false claims for Patient 1 in and after June 2013.

### B.     Audit Sample Patient 2

117.     Patient 2 was admitted to hospice by Caris on March 19, 2010 at Caris's Sevierville facility, purportedly for congestive heart failure.

118.     As of April 2013, Patient 2 had been on hospice with Caris for 1,139 days (over three years).  Based on the auditor's "snapshot" review, the auditor determined that Patient 2's hospice eligibility and limited prognosis was not supportable because, although Patient 2 had congestive heart failure, the auditor found that she did not meet the criteria for *end-stage* congestive heart failure. Specifically, the auditor found that, *inter alia*, during the period under review, there was no evidence of decline, such as skin breakdown, infection, weight loss, weakness, or fatigue.   For these reasons, the Caris auditor found that the patient's condition as reflected in the documentation submitted for review for Patient 2 was insufficient to support hospice eligibility during the April 2013 time period.

119.     Caris submitted the following claims to Medicare for Patient 2 and received the following payments:

| From Date | Through Date | Paid Date | Amount Billed | Amount Paid |
|-----------|--------------|-----------|---------------|-------------|
| 03/19/10  | 03/31/10     | 06/04/10  | $3,570.85     | $1,630.87   |
| 03/19/10  | 03/31/10     | 07/25/11  | ($3,570.85)   | ($1,630.87) |
| 04/01/10  | 04/30/10     | 06/17/10  | $6,698.50     | $3,763.55   |
| 05/01/10  | 05/31/10     | 06/29/10  | $6,248.95     | $3,889.01   |

30

| | | | | |
|---|---|---|---|---|
| 06/01/10 | 06/30/10 | 07/19/10 | $6,783.50 | $3,763.55 |
| 07/01/10 | 07/31/10 | 08/18/10 | $5,768.95 | $3,889.01 |
| 08/01/10 | 08/31/10 | 09/17/10 | $6,463.95 | $3,889.01 |
| 09/01/10 | 09/30/10 | 10/19/10 | $6,103.50 | $3,763.55 |
| 10/01/10 | 10/31/10 | 11/17/10 | $6,376.72 | $3,971.79 |
| 11/01/10 | 11/30/10 | 12/16/10 | $6,423.60 | $3,843.67 |
| 12/01/10 | 12/31/10 | 01/20/11 | $6,281.72 | $3,971.79 |
| 01/01/11 | 01/31/11 | 02/16/11 | $6,496.72 | $3,971.79 |
| 02/01/11 | 02/28/11 | 03/21/11 | $6,262.36 | $3,587.42 |
| 03/01/11 | 03/31/11 | 04/29/11 | $6,681.72 | $3,971.79 |
| 04/01/11 | 04/30/11 | 05/16/11 | $6,518.60 | $3,843.67 |
| 05/01/11 | 06/30/11 | 12/01/11 | $13,690.32 | $7,815.46 |
| 07/01/11 | 08/31/11 | 01/03/12 | $13,703.44 | $7,943.58 |
| 09/01/11 | 09/30/11 | 01/27/12 | $6,938.60 | $3,843.67 |
| 10/01/11 | 10/31/11 | 01/27/12 | $6,786.07 | $4,090.99 |
| 11/01/11 | 11/30/11 | 02/03/12 | $6,879.10 | $3,959.02 |
| 12/01/11 | 12/31/11 | 02/08/12 | $7,026.07 | $4,090.99 |
| 01/01/12 | 01/31/12 | 02/16/12 | $7,461.07 | $4,090.99 |
| 01/01/12 | 01/31/12 | 02/13/12 | $7,461.07 | $0.00 |
| 02/01/12 | 02/29/12 | 03/21/12 | $6,272.13 | $3,827.06 |
| 03/01/12 | 03/31/12 | 04/17/12 | $6,511.07 | $4,090.99 |
| 04/01/12 | 04/30/12 | 05/16/12 | $6,289.10 | $3,959.02 |
| 05/01/12 | 05/31/12 | 06/15/12 | $6,601.07 | $4,090.99 |
| 06/01/12 | 06/30/12 | 07/17/12 | $6,659.10 | $3,959.02 |
| 07/01/12 | 07/31/12 | 08/16/12 | $6,851.07 | $4,090.99 |
| 08/01/12 | 08/31/12 | 09/19/12 | $6,831.07 | $4,090.99 |
| 09/01/12 | 09/30/12 | 10/18/12 | $6,549.10 | $3,959.02 |
| 10/01/12 | 10/31/12 | 11/19/12 | $7,033.16 | $4,103.22 |
| 11/01/12 | 11/30/12 | 12/18/12 | $7,030.80 | $3,970.86 |
| 12/01/12 | 12/31/12 | 01/16/13 | $7,328.16 | $4,103.22 |
| 01/01/13 | 01/31/13 | 02/15/13 | $6,638.16 | $4,103.22 |
| 02/01/13 | 02/28/13 | 03/19/13 | $6,351.08 | $3,706.14 |
| 03/01/13 | 03/31/13 | 04/29/13 | $6,218.16 | $4,103.22 |
| 04/01/13 | 04/30/13 | 05/17/13 | $6,615.80 | $3,891.44 |
| 05/01/13 | 05/31/13 | 06/13/13 | $6,878.16 | $0.00 |
| 05/01/13 | 05/31/13 | 06/19/13 | $6,878.16 | $4,021.16 |
| 06/01/13 | 06/30/13 | 07/17/13 | $7,970.80 | $3,891.44 |
| 07/01/13 | 07/31/13 | 08/19/13 | $6,983.16 | $4,021.16 |
| 08/01/13 | 08/31/13 | 09/20/13 | $8,058.16 | $4,021.16 |
| 09/01/13 | 09/30/13 | 10/17/13 | $6,470.80 | $3,891.44 |

| | | | | |
|---|---|---|---|---|
| 10/01/13 | 10/31/13 | 11/26/13 | $7,202.91 | $4,089.57 |
| 11/01/13 | 11/30/13 | 12/17/13 | $6,883.30 | $3,957.65 |
| 12/01/13 | 12/31/13 | 01/29/14 | $6,802.91 | $4,089.57 |
| 01/01/14 | 01/31/14 | 02/18/14 | $6,512.91 | $4,089.57 |
| 02/01/14 | 02/28/14 | 04/01/14 | $6,179.08 | $3,693.81 |
| 03/01/14 | 03/31/14 | 04/17/14 | $6,562.91 | $4,089.57 |
| 04/01/14 | 04/30/14 | 05/21/14 | $6,968.94 | $3,957.65 |
| 05/01/14 | 05/05/14 | 05/30/14 | $1,645.89 | $659.61 |
| **Totals** | | | **$344,831.65** | **$194,477.06** |

120.     Despite the auditor's findings in June 2013 that Patient 2 was ineligible for hospice benefits in April 2013, Caris did not return any of the payments it received for Patient 2 for claims submitted based on the physician certification(s) that covered the April 2013 time period (i.e., the claims submitted for the months March and April 2013).

121.     Upon information and belief, Caris also did not undertake adequate due diligence of Patient 2's medical records and certifications to determine whether Patient 2 had been hospice-eligible before April 2013 and, if not, whether it had an obligation to return overpayments it had received from Medicare for services rendered prior to April 2013. Therefore, upon information and belief, Caris knowingly retained overpayments related to some or all of the claims Caris submitted for Patient 2 prior to April 2013.

122.     In addition, despite the auditor's findings in June 2013 that Patient 2 was ineligible for hospice benefits in April 2013, Caris continued to submit claims for Patient 2 in and after June 2013. Yet, upon information and belief, Caris did not monitor or reevaluate Patient 2 to determine whether Patient 2 was hospice-eligible in and after June 2013. Therefore, upon information and belief, Caris knowingly submitted false claims for Patient 2 in and after June 2013.

32

### C.   Audit Sample Patient 3

123.    Patient 3 was admitted to hospice by Caris in March 2009 at Caris's Nashville facility, purportedly for dementia.

124.    As of April 2013, Patient 3 had been on hospice with Caris for 1,512 days (more than four years). Based on the auditor's "snapshot" review, the auditor determined that Patient 3's hospice eligibility and limited prognosis was not supportable because, *inter alia*, during the period under review, Patient 3's weight and body mass index improved; Patient 3 did not experience any complications from her comorbid conditions; Patient 3 had stable vital signs; and Patient 3 was able to communicate and make her needs known. For these reasons, the Caris auditor found that the patient's condition as reflected in the documentation submitted for review for Patient 3 was insufficient to support hospice eligibility during the April 2013 time period.

125.    Caris submitted the following claims to Medicare for Patient 3 and received the following payments:

| From Date | Through Date | Paid Date | Amount Billed | Amount Paid |
|-----------|-------------|-----------|---------------|-------------|
| 03/11/09 | 03/31/09 | 04/20/09 | $4,486.15 | $3,006.21 |
| 03/11/09 | 03/31/09 | 10/07/09 | ($4,486.15) | ($3,006.21) |
| 04/01/09 | 04/30/09 | 05/19/09 | $6,794.50 | $4,294.59 |
| 05/01/09 | 05/31/09 | 06/18/09 | $6,717.65 | $4,437.74 |
| 06/01/09 | 06/30/09 | 07/17/09 | $6,414.50 | $4,294.59 |
| 07/01/09 | 07/31/09 | 08/20/09 | $6,897.65 | $4,437.74 |
| 08/01/09 | 08/31/09 | 09/17/09 | $6,397.65 | $4,437.74 |
| 09/01/09 | 09/30/09 | 10/20/09 | $6,274.50 | $4,294.59 |
| 10/01/09 | 10/31/09 | 11/19/09 | $6,219.82 | $4,439.95 |
| 11/01/09 | 11/30/09 | 12/28/09 | $6,076.60 | $4,296.73 |
| 12/01/09 | 12/31/09 | 01/20/10 | $6,299.82 | $4,439.95 |
| 01/01/10 | 01/31/10 | 02/19/10 | $5,844.82 | $4,439.95 |
| 01/01/10 | 01/31/10 | 04/20/11 | ($5,844.82) | ($4,439.95) |
| 02/01/10 | 02/28/10 | 03/17/10 | $5,635.16 | $4,010.28 |
| 02/01/10 | 02/28/10 | 04/20/11 | ($5,635.16 ) | ($4,010.28) |
| 03/01/10 | 03/31/10 | 04/19/10 | $6,369.82 | $4,439.95 |

33

| | | | | |
|---|---|---|---|---|
| 03/01/10 | 03/31/10 | 04/20/11 | ($6,369.82) | ($4,439.95) |
| 04/01/10 | 04/30/10 | 05/19/10 | $5,866.60 | $4,296.73 |
| 04/01/10 | 04/30/10 | 04/20/11 | ($5,866.60) | ($4,296.73) |
| 05/01/10 | 05/31/10 | 06/21/10 | $6,104.82 | $4,439.95 |
| 06/01/10 | 06/30/10 | 07/19/10 | $6,421.60 | $4,296.73 |
| 07/01/10 | 07/31/10 | 08/18/10 | $5,864.82 | $4,439.95 |
| 08/01/10 | 08/31/10 | 09/17/10 | $6,294.82 | $4,439.95 |
| 09/01/10 | 09/30/10 | 10/19/10 | $5,831.60 | $4,296.73 |
| 10/01/10 | 10/31/10 | 11/17/10 | $6,155.83 | $4,585.82 |
| 11/01/10 | 11/30/10 | 12/16/10 | $5,802.90 | $4,437.89 |
| 12/01/10 | 12/31/10 | 01/18/11 | $6,595.33 | $4,585.82 |
| 01/01/11 | 01/31/11 | 02/16/11 | $6,120.33 | $4,585.82 |
| 02/01/11 | 02/28/11 | 03/17/11 | $5,962.04 | $4,142.03 |
| 03/01/11 | 03/31/11 | 04/18/11 | $6,100.83 | $4,585.82 |
| 04/01/11 | 04/30/11 | 05/16/11 | $6,217.90 | $4,437.89 |
| 05/01/11 | 05/31/11 | 06/17/11 | $6,255.83 | $4,585.82 |
| 06/01/11 | 06/30/11 | 07/19/11 | $6,167.90 | $4,437.89 |
| 07/01/11 | 07/31/11 | 08/16/11 | $6,075.83 | $4,585.82 |
| 08/01/11 | 08/31/11 | 10/26/11 | $6,480.33 | $4,585.82 |
| 09/01/11 | 09/30/11 | 11/15/11 | $6,127.90 | $4,437.89 |
| 10/01/11 | 10/31/11 | 11/28/11 | $6,349.04 | $0.00 |
| 10/01/11 | 10/31/11 | 12/01/11 | $6,349.04 | $4,614.05 |
| 11/01/11 | 11/30/11 | 12/16/11 | $5,795.20 | $4,465.21 |
| 12/01/11 | 12/31/11 | 01/19/12 | $6,384.04 | $4,614.05 |
| 01/01/12 | 01/31/12 | 02/10/12 | $6,104.04 | $0.00 |
| 01/01/12 | 01/31/12 | 02/16/12 | $6,104.04 | $4,614.05 |
| 02/01/12 | 02/29/12 | 03/23/12 | $5,791.36 | $4,316.37 |
| 03/01/12 | 03/31/12 | 04/17/12 | $5,934.04 | $4,614.05 |
| 04/01/12 | 04/30/12 | 05/16/12 | $6,210.20 | $4,465.21 |
| 05/01/12 | 05/31/12 | 06/18/12 | $6,204.04 | $4,614.05 |
| 06/01/12 | 06/30/12 | 07/17/12 | $5,935.20 | $4,465.21 |
| 07/01/12 | 07/31/12 | 08/16/12 | $6,704.04 | $4,614.05 |
| 08/01/12 | 08/31/12 | 09/19/12 | $7,319.04 | $4,614.05 |
| 09/01/12 | 09/30/12 | 10/18/12 | $6,794.70 | $4,465.21 |
| 10/01/12 | 10/31/12 | 11/19/12 | $7,249.27 | $4,624.24 |
| 11/01/12 | 11/30/12 | 12/18/12 | $7,120.10 | $4,475.07 |
| 12/01/12 | 12/31/12 | 01/17/13 | $7,279.27 | $4,624.24 |
| 01/01/13 | 01/31/13 | 02/19/13 | $7,033.77 | $4,624.24 |
| 02/01/13 | 02/28/13 | 03/19/13 | $6,851.26 | $4,176.74 |
| 03/01/13 | 03/31/13 | 04/17/13 | $7,243.77 | $4,624.24 |

34

| | | | | |
|---|---|---|---|---|
| 04/01/13 | 04/30/13 | 05/17/13 | $7,870.10 | $4,385.57 |
| 05/01/13 | 05/31/13 | 06/19/13 | $7,548.77 | $4,531.76 |
| 06/01/13 | 06/30/13 | 07/17/13 | $7,045.10 | $4,385.57 |
| 07/01/13 | 07/31/13 | 08/19/13 | $6,374.27 | $4,531.76 |
| 08/01/13 | 08/31/13 | 09/20/13 | $6,334.27 | $4,531.76 |
| 09/01/13 | 09/30/13 | 10/16/13 | $5,940.10 | $4,385.57 |
| 10/01/13 | 10/31/13 | 11/22/13 | $6,666.18 | $4,489.62 |
| 11/01/13 | 11/30/13 | 12/17/13 | $5,982.90 | $4,344.79 |
| 12/01/13 | 12/13/13 | 01/16/14 | $2,781.14 | $1,882.74 |
| **Totals** | | | **$349,971.59** | **$234,374.73** |

126. Despite the auditor's findings in June 2013 that Patient 3 was ineligible for hospice benefits in April 2013, Caris did not return any of the payments it received for Patient 3 for claims submitted based on the physician certification(s) that covered the April 2013 time period (i.e., the claims submitted for the months April, May, and June 2013).

127. Upon information and belief, Caris also did not undertake adequate due diligence of Patient 3's medical records and certifications to determine whether Patient 3 had been hospice-eligible before April 2013 and, if not, whether it had an obligation to return overpayments it had received from Medicare for services rendered prior to April 2013. Therefore, upon information and belief, Caris knowingly retained overpayments related to some or all of the claims Caris submitted for Patient 3 prior to April 2013.

128. In addition, despite the auditor's findings in June 2013 that Patient 3 was ineligible for hospice benefits in April 2013, Caris continued to submit claims for Patient 3 in and after June 2013. Yet, upon information and belief, Caris did not monitor or reevaluate Patient 3 to determine whether Patient 3 was hospice-eligible in and after June 2013. Therefore, upon information and belief, Caris knowingly submitted false claims for Patient 3 in and after June 2013.

35

### D. Audit Sample Patient 4

129. Patient 4 was admitted to hospice by Caris in January 2010 at Caris's Nashville facility, purportedly for dementia.

130. As of April 2013, Patient 4 had been on service with Caris for 1,209 days (over three years). Based on the auditor's "snapshot" review, the auditor determined that Patient 4's hospice eligibility and limited prognosis was not supportable because, *inter alia*, during the period under review, Patient 4's weight improved; Patient 4 had stable vital signs; and there was no evidence of infection or complications from Patient 4's comorbid conditions. For these reasons, the Caris auditor found that the patient's condition as reflected in the documentation submitted for review for Patient 4 was insufficient to support hospice eligibility during the April 2013 time period.

131. Caris submitted the following claims to Medicare for Patient 4 and received the following payments:

| From Date | Through Date | Paid Date | Amount Billed | Amount Paid |
|-----------|--------------|-----------|---------------|-------------|
| 01/08/10 | 01/31/10 | 02/19/10 | $5,142.28 | $3,437.38 |
| 01/08/10 | 01/31/10 | 04/15/11 | ($5,142.28) | ($3,437.38) |
| 02/01/10 | 02/28/10 | 03/17/10 | $5,970.16 | $4,010.28 |
| 02/01/10 | 02/28/10 | 04/15/11 | ($5,970.16) | ($4,010.28) |
| 03/01/10 | 03/31/10 | 04/19/10 | $6,069.82 | $4,439.95 |
| 03/01/10 | 03/31/10 | 04/15/11 | ($6,069.82) | ($4,439.95) |
| 04/01/10 | 04/30/10 | 05/19/10 | $5,716.60 | $4,296.73 |
| 04/01/10 | 04/30/10 | 04/15/11 | ($5,716.60) | ($4,296.73) |
| 05/01/10 | 05/31/10 | 06/21/10 | $6,179.82 | $4,439.95 |
| 06/01/10 | 06/30/10 | 07/19/10 | $6,306.60 | $4,296.73 |
| 07/01/10 | 07/31/10 | 08/18/10 | $6,339.82 | $4,439.95 |
| 08/01/10 | 08/31/10 | 09/17/10 | $6,439.82 | $4,439.95 |
| 09/01/10 | 09/30/10 | 10/19/10 | $6,176.60 | $4,296.73 |
| 10/01/10 | 10/31/10 | 11/17/10 | $6,445.83 | $4,585.82 |
| 11/01/10 | 11/30/10 | 12/16/10 | $6,257.90 | $4,437.89 |
| 12/01/10 | 12/31/10 | 01/18/11 | $7,005.83 | $4,585.82 |

36

| | | | | |
|---|---|---|---|---|
| 01/01/11 | 01/31/11 | 02/16/11 | $6,365.83 | $4,585.82 |
| 02/01/11 | 02/28/11 | 03/17/11 | $5,687.04 | $4,142.03 |
| 03/01/11 | 03/31/11 | 04/18/11 | $6,660.83 | $4,585.82 |
| 04/01/11 | 04/30/11 | 05/16/11 | $6,352.90 | $4,437.89 |
| 05/01/11 | 05/31/11 | 06/17/11 | $6,225.83 | $4,585.82 |
| 06/01/11 | 06/30/11 | 07/19/11 | $6,497.90 | $4,437.89 |
| 07/01/11 | 07/31/11 | 08/16/11 | $6,285.83 | $4,585.82 |
| 08/01/11 | 08/31/11 | 09/16/11 | $6,825.83 | $4,585.82 |
| 09/01/11 | 09/30/11 | 10/19/11 | $6,017.90 | $4,437.89 |
| 10/01/11 | 10/31/11 | 11/22/11 | $6,259.04 | $4,614.05 |
| 11/01/11 | 11/30/11 | 12/16/11 | $6,225.20 | $4,465.21 |
| 12/01/11 | 12/31/11 | 01/19/12 | $6,194.04 | $4,614.05 |
| 01/01/12 | 01/31/12 | 02/10/12 | $6,194.04 | $0.00 |
| 01/01/12 | 01/31/12 | 02/16/12 | $6,194.04 | $4,614.05 |
| 02/01/12 | 02/29/12 | 04/03/12 | $6,256.36 | $4,316.37 |
| 03/01/12 | 03/31/12 | 04/17/12 | $6,259.04 | $4,614.05 |
| 04/01/12 | 04/30/12 | 05/16/12 | $6,445.20 | $4,465.21 |
| 05/01/12 | 05/31/12 | 06/18/12 | $6,189.04 | $4,614.05 |
| 06/01/12 | 06/30/12 | 07/17/12 | $6,175.20 | $4,465.21 |
| 07/01/12 | 07/31/12 | 08/16/12 | $6,344.04 | $4,614.05 |
| 08/01/12 | 08/31/12 | 09/19/12 | $7,434.04 | $4,614.05 |
| 09/01/12 | 09/30/12 | 10/18/12 | $6,395.20 | $4,465.21 |
| 10/01/12 | 10/31/12 | 11/19/12 | $7,244.27 | $4,624.24 |
| 11/01/12 | 11/30/12 | 12/18/12 | $6,120.10 | $4,475.07 |
| 12/01/12 | 12/31/12 | 01/17/13 | $6,269.27 | $4,624.24 |
| 01/01/13 | 01/31/13 | 02/19/13 | $6,909.27 | $4,624.24 |
| 02/01/13 | 02/28/13 | 03/19/13 | $6,041.76 | $4,176.74 |
| 03/01/13 | 03/31/13 | 04/17/13 | $6,714.27 | $4,624.24 |
| 04/01/13 | 04/30/13 | 05/23/13 | $6,990.10 | $4,385.57 |
| 05/01/13 | 05/31/13 | 06/25/13 | $7,399.27 | $4,531.76 |
| 06/01/13 | 06/30/13 | 07/24/13 | $7,225.10 | $4,385.57 |
| 07/01/13 | 07/31/13 | 08/19/13 | $6,749.27 | $4,531.76 |
| 08/01/13 | 08/31/13 | 10/01/13 | $6,599.27 | $4,531.76 |
| 09/01/13 | 09/30/13 | 10/16/13 | $6,535.10 | $4,385.57 |
| 10/01/13 | 10/31/13 | 11/18/13 | $7,176.18 | $4,489.62 |
| 11/01/13 | 11/30/13 | 12/17/13 | $6,393.40 | $4,344.79 |
| 12/01/13 | 12/31/13 | 01/16/14 | $7,011.18 | $4,489.62 |
| 01/01/14 | 01/31/14 | 02/18/14 | $6,501.18 | $4,489.62 |
| 02/01/14 | 02/28/14 | 03/17/14 | $7,457.84 | $4,055.13 |
| 03/01/14 | 03/31/14 | 04/17/14 | $7,741.18 | $4,489.62 |

| 04/01/14 | 04/30/14 | 09/16/14 | $7,019.26 | $4,344.79 |
|---|---|---|---|---|
| 05/01/14 | 05/31/14 | 09/29/14 | $7,186.79 | $4,489.62 |
| 06/01/14 | 06/30/14 | 10/01/14 | $7,009.01 | $4,344.79 |
| 07/01/14 | 07/31/14 | 10/03/14 | $7,360.82 | $4,489.62 |
| 08/01/14 | 08/31/14 | 10/06/14 | $7,318.81 | $4,489.62 |
| 09/01/14 | 09/30/14 | 10/20/14 | $6,733.40 | $4,344.79 |
| 10/01/14 | 10/31/14 | 11/19/14 | $6,812.02 | $4,583.31 |
| 11/01/14 | 11/28/14 | 12/17/14 | $6,042.48 | $4,139.76 |
| **Totals** | | | **$369,197.19** | **$245,868.66** |

132.     Despite the auditor's findings, in June 2013, that Patient 4 was ineligible for hospice benefits in April 2013, Caris did not return any of the payments it received for Patient 4 for claims submitted based on the physician certification(s) that covered the April 2013 time period (i.e., the claims submitted for the months April, May, and June 2013).

133.     Upon information and belief, Caris also did not undertake adequate due diligence of Patient 4's medical records and certifications to determine whether Patient 4 had been hospice-eligible before April 2013 and, if not, whether it had an obligation to return overpayments it had received from Medicare for services rendered prior to April 2013. Therefore, upon information and belief, Caris knowingly retained overpayments related to some or all of the claims Caris submitted for Patient 4 prior to April 2013.

134.     In addition, despite the auditor's findings in June 2013 that Patient 4 was ineligible for hospice benefits in April 2013, Caris continued to submit claims for Patient 4 in and after June 2013.  Yet, upon information and belief, Caris did not monitor or reevaluate Patient 4 to determine whether Patient 4 was hospice-eligible in and after June 2013.  Therefore, upon information and belief, Caris knowingly submitted false claims for Patient 4 in and after June 2013.

### E.    Audit Sample Patient 5

135.    Patient 5 was admitted to hospice by Caris in February 2008 at Caris's Johnson City facility, purportedly for Alzheimer's Disease.

136.    The diagnosis of Alzheimer's Disease can be end-stage if it is characterized by loss of speech, locomotion, and consciousness. *See, e.g.*, Palmetto GBA's Local Coverage Determination for Hospice Alzheimer's Disease & Related Disorders (L31539).

137.    As of April 2013, Patient 5 had been on hospice with Caris for 1,896 days (over 5 years). Based on the auditor's "snapshot" review, the auditor determined that Patient 5's hospice eligibility and limited prognosis was not supportable because, *inter alia*, during the period under review, Patient 5's medical records did not show any evidence of decline in the terminal diagnosis or comorbid conditions. For these reasons, the Caris auditor found that the patient's condition as reflected in the documentation submitted for review for Patient 5 was insufficient to support hospice eligibility during the April 2013 time period.

138.    Caris submitted the following claims to Medicare for Patient 5 and received the following payments:

| From Date | Through Date | Paid Date | Amount Billed | Amount Paid |
|-----------|--------------|-----------|---------------|-------------|
| 02/22/09 | 02/28/09 | 03/20/09 | $1,692.39 | $852.36 |
| 02/22/09 | 02/28/09 | 12/29/09 | ($1,692.39) | ($860.97) |
| 03/01/09 | 03/08/09 | 04/20/09 | $1,424.00 | $983.97 |
| 03/01/09 | 03/08/09 | 12/28/09 | ($1,424.00) | ($983.97) |
| 03/05/10 | 03/31/10 | 04/19/10 | $6,377.15 | $3,387.20 |
| 03/05/10 | 03/31/10 | 04/25/11 | ($6,377.15) | ($3,387.20) |
| 04/01/10 | 04/30/10 | 05/19/10 | $6,308.50 | $3,763.55 |
| 04/01/10 | 04/30/10 | 04/25/11 | ($6,308.50) | ($3,763.55) |
| 05/01/10 | 05/31/10 | 06/18/10 | $5,943.95 | $3,889.01 |
| 06/01/10 | 06/30/10 | 07/19/10 | $5,968.50 | $3,763.55 |
| 07/01/10 | 07/31/10 | 08/18/10 | $6,258.95 | $3,889.01 |
| 08/01/10 | 08/31/10 | 09/17/10 | $6,303.95 | $3,889.01 |
| 09/01/10 | 09/30/10 | 10/19/10 | $5,703.50 | $3,763.55 |

39

| | | | | |
|---|---|---|---|---|
| 10/01/10 | 10/31/10 | 11/17/10 | $6,236.72 | $3,971.79 |
| 11/01/10 | 11/30/10 | 12/30/10 | $5,558.60 | $3,843.67 |
| 12/01/10 | 12/31/10 | 01/18/11 | $6,211.72 | $3,971.79 |
| 01/01/11 | 01/31/11 | 02/25/11 | $6,251.22 | $3,971.79 |
| 02/01/11 | 02/28/11 | 03/17/11 | $5,537.36 | $3,587.42 |
| 03/01/11 | 03/31/11 | 04/18/11 | $6,321.22 | $3,971.79 |
| 04/01/11 | 04/30/11 | 05/16/11 | $5,963.10 | $3,843.67 |
| 05/01/11 | 05/31/11 | 06/22/11 | $6,861.22 | $3,971.79 |
| 06/01/11 | 06/30/11 | 07/19/11 | $6,798.60 | $3,843.67 |
| 07/01/11 | 07/31/11 | 08/16/11 | $6,351.72 | $3,971.79 |
| 08/01/11 | 08/31/11 | 09/16/11 | $6,671.72 | $3,971.79 |
| 09/01/11 | 09/30/11 | 10/19/11 | $6,738.10 | $3,843.67 |
| 10/01/11 | 10/31/11 | 11/16/11 | $6,310.57 | $4,090.99 |
| 11/01/11 | 11/30/11 | 12/16/11 | $6,294.10 | $3,959.02 |
| 12/01/11 | 12/31/11 | 01/19/12 | $6,476.07 | $4,090.99 |
| 01/01/12 | 01/31/12 | 02/16/12 | $6,396.07 | $4,090.99 |
| 02/01/12 | 02/29/12 | 03/21/12 | $5,886.63 | $3,827.06 |
| 03/01/12 | 03/31/12 | 04/17/12 | $6,331.07 | $4,090.99 |
| 04/01/12 | 04/30/12 | 05/16/12 | $5,823.60 | $3,959.02 |
| 05/01/12 | 05/31/12 | 06/15/12 | $6,666.07 | $4,090.99 |
| 06/01/12 | 06/30/12 | 07/17/12 | $6,194.10 | $3,959.02 |
| 07/01/12 | 07/31/12 | 08/16/12 | $6,275.57 | $4,090.99 |
| 08/01/12 | 08/31/12 | 09/19/12 | $6,425.57 | $4,090.99 |
| 09/01/12 | 09/30/12 | 10/18/12 | $5,609.10 | $3,959.02 |
| 10/01/12 | 10/31/12 | 11/19/12 | $6,077.66 | $4,103.22 |
| 11/01/12 | 11/30/12 | 12/18/12 | $6,094.80 | $3,970.86 |
| 12/01/12 | 12/31/12 | 01/16/13 | $5,628.16 | $4,103.22 |
| 01/01/13 | 01/31/13 | 02/15/13 | $6,502.16 | $4,103.22 |
| 02/01/13 | 02/28/13 | 03/19/13 | $5,725.08 | $3,706.13 |
| 03/01/13 | 03/31/13 | 04/29/13 | $6,703.16 | $4,103.22 |
| 04/01/13 | 04/30/13 | 05/17/13 | $6,520.80 | $3,891.44 |
| 05/01/13 | 05/31/13 | 06/28/13 | $6,491.38 | $4,040.00 |
| 06/01/13 | 06/30/13 | 07/17/13 | $6,109.63 | $3,919.69 |
| 07/01/13 | 07/31/13 | 08/19/13 | $7,198.16 | $4,021.16 |
| 08/01/13 | 08/31/13 | 09/20/13 | $6,113.16 | $4,021.16 |
| 09/01/13 | 09/30/13 | 10/17/13 | $5,650.80 | $3,891.44 |
| 10/01/13 | 10/31/13 | 11/15/13 | $6,007.91 | $4,089.57 |
| 11/01/13 | 11/30/13 | 12/18/13 | $5,538.30 | $3,957.65 |
| 12/01/13 | 12/27/13 | 01/16/14 | $5,154.47 | $3,561.89 |
| 03/08/14 | 03/31/14 | 04/17/14 | $5,885.64 | $3,166.13 |

Case 3:14-cv-00212-TAV-HBG   Document 57   Filed 10/11/16   Page 40 of 49   PageID #: 241

| 04/01/14 | 04/30/14 | 05/21/14 | $6,743.30 | $3,957.65 |
| 05/01/14 | 05/04/14 | 05/30/14 | $1,168.44 | $527.69 |
| **Totals** | | | **$285,681.68** | **$181,385.56** |

139.     Despite the auditor's finding in June 2013 that Patient 5 was ineligible for hospice benefits in April 2013, Caris did not return any of the payments it received for Patient 5 for claims submitted based on the physician certification(s) that covered the April 2013 time period (i.e., the claims submitted for the months April and May 2013).

140.     Upon information and belief, Caris also did not undertake adequate due diligence of Patient 5's medical records and certifications to determine whether Patient 5 had been hospice-eligible before April 2013 and, if not, whether it had an obligation to return overpayments it had received from Medicare for services rendered prior to April 2013. Therefore, upon information and belief, Caris knowingly retained overpayments related to some or all of the claims Caris submitted for Patient 5 prior to April 2013.

141.     In addition, despite the auditor's findings in June 2013 that Patient 5 was ineligible for hospice benefits in April 2013, Caris continued to submit claims for Patient 5 in and after June 2013. Yet, upon information and belief, Caris did not monitor or reevaluate Patient 5 to determine whether Patient 5 was hospice-eligible in and after June 2013. Therefore, upon information and belief, Caris knowingly submitted false claims for Patient 5 in and after June 2013.

**F.     Audit Sample Patient 6**

142.     Patient 6 was admitted to hospice by Caris in December 2009 at Caris's Dickson facility, purportedly for senile dementia with depressive features.

41

143. As of April 2013, Patient 6 had been on hospice with Caris for 1,230 days (over 3 years). Based on the auditor's "snapshot" review, the auditor determined that Patient 6's hospice eligibility and limited prognosis was questionable because, *inter alia*, during the period under review, Patient 6's medical records showed Patient 6 experience a weight loss of less than one percent total body mass; Patient 6 had stable vital signs; and there was no evidence of symptomatic secondary or comorbid conditions. Although Patient 6 had experienced an episode of vomiting and there was a note indicating a "recent infection," no additional information documented specific information about these incidents. For these reasons, the Caris auditor found that the patient's condition as reflected in the documentation submitted for review for Patient 6 was insufficient to support hospice eligibility during the April 2013 time period.

144. Caris submitted the following claims to Medicare for Patient 6 and received the following payments:

| From Date | Through Date | Paid Date | Amount Billed | Amount Paid |
|-----------|--------------|-----------|---------------|-------------|
| 12/18/09 | 12/31/09 | 01/20/10 | $3,325.08 | $2,005.14 |
| 01/01/10 | 01/31/10 | 02/19/10 | $6,389.82 | $4,439.95 |
| 01/01/10 | 01/31/10 | 07/25/11 | ($6,389.82) | ($4,439.95) |
| 02/01/10 | 02/28/10 | 03/17/10 | $5,760.16 | $4,010.28 |
| 02/01/10 | 02/28/10 | 07/25/11 | ($5,760.16) | ($4,010.28) |
| 03/01/10 | 03/31/10 | 04/19/10 | $6,959.82 | $4,439.95 |
| 03/01/10 | 03/31/10 | 07/25/11 | ($6,959.82) | ($4,439.95) |
| 04/01/10 | 04/30/10 | 05/27/10 | $6,656.60 | $4,296.73 |
| 04/01/10 | 04/30/10 | 07/25/11 | ($6,656.60) | ($4,296.73) |
| 05/01/10 | 05/31/10 | 06/21/10 | $5,919.82 | $4,439.95 |
| 06/01/10 | 06/30/10 | 07/28/10 | $6,656.60 | $4,296.73 |
| 07/01/10 | 07/31/10 | 08/18/10 | $6,229.82 | $4,439.95 |
| 08/01/10 | 08/31/10 | 09/23/10 | $6,314.82 | $4,439.95 |
| 09/01/10 | 09/30/10 | 10/19/10 | $5,801.60 | $4,296.73 |
| 10/01/10 | 10/31/10 | 11/24/10 | $5,336.72 | $4,585.82 |
| 11/01/10 | 11/30/10 | 12/16/10 | $5,208.60 | $4,437.89 |
| 12/01/10 | 12/31/10 | 01/18/11 | $5,591.72 | $4,585.82 |
| 01/01/11 | 01/31/11 | 02/16/11 | $5,715.83 | $4,585.82 |

42

| | | | | |
|---|---|---|---|---|
| 02/01/11 | 02/28/11 | 03/17/11 | $5,580.04 | $4,142.03 |
| 03/01/11 | 03/31/11 | 04/18/11 | $5,750.83 | $4,585.82 |
| 04/01/11 | 04/30/11 | 05/23/11 | $6,122.90 | $4,437.89 |
| 05/01/11 | 05/31/11 | 06/17/11 | $6,215.83 | $4,585.82 |
| 06/01/11 | 06/30/11 | 07/20/11 | $5,776.90 | $4,437.89 |
| 07/01/11 | 07/31/11 | 08/16/11 | $6,009.83 | $4,585.82 |
| 08/01/11 | 08/31/11 | 09/16/11 | $6,014.83 | $4,585.82 |
| 09/01/11 | 09/30/11 | 10/19/11 | $5,842.90 | $4,437.89 |
| 10/01/11 | 10/31/11 | 11/16/11 | $5,874.04 | $4,614.05 |
| 11/01/11 | 11/30/11 | 12/16/11 | $6,525.20 | $4,465.21 |
| 12/01/11 | 12/31/11 | 01/19/12 | $6,114.04 | $4,614.05 |
| 01/01/12 | 01/31/12 | 02/16/12 | $6,568.04 | $4,614.05 |
| 02/01/12 | 02/29/12 | 03/22/12 | $5,906.36 | $4,316.37 |
| 03/01/12 | 03/31/12 | 04/17/12 | $6,064.04 | $4,614.05 |
| 04/01/12 | 04/30/12 | 05/16/12 | $6,225.20 | $4,465.21 |
| 05/01/12 | 05/31/12 | 06/15/12 | $6,184.04 | $4,614.05 |
| 06/01/12 | 06/30/12 | 07/17/12 | $5,684.20 | $4,465.21 |
| 07/01/12 | 07/31/12 | 08/16/12 | $5,823.04 | $4,614.05 |
| 08/01/12 | 08/31/12 | 09/19/12 | $6,444.04 | $4,614.05 |
| 09/01/12 | 09/30/12 | 10/18/12 | $5,959.70 | $4,465.21 |
| 10/01/12 | 10/31/12 | 11/19/12 | $6,114.27 | $4,624.24 |
| 11/01/12 | 11/30/12 | 12/18/12 | $5,809.60 | $4,475.07 |
| 12/01/12 | 12/31/12 | 01/17/13 | $6,028.77 | $4,624.24 |
| 01/01/13 | 01/31/13 | 02/20/13 | $6,204.27 | $4,624.24 |
| 02/01/13 | 02/28/13 | 03/19/13 | $5,406.76 | $4,176.74 |
| 03/01/13 | 03/31/13 | 04/17/13 | $6,239.27 | $4,624.24 |
| 04/01/13 | 04/30/13 | 05/17/13 | $5,970.10 | $4,385.57 |
| 05/01/13 | 05/31/13 | 06/19/13 | $6,149.27 | $4,531.76 |
| 06/01/13 | 06/30/13 | 07/17/13 | $6,069.60 | $4,385.57 |
| 07/01/13 | 07/31/13 | 09/03/13 | $7,074.27 | $4,531.76 |
| 08/01/13 | 08/31/13 | 09/19/13 | $6,234.27 | $4,531.76 |
| 09/01/13 | 09/30/13 | 10/23/13 | $6,260.10 | $4,385.57 |
| 10/01/13 | 10/31/13 | 11/18/13 | $6,191.18 | $4,489.62 |
| 11/01/13 | 11/30/13 | 12/31/13 | $6,053.40 | $4,344.79 |
| 12/01/13 | 12/31/13 | 01/17/14 | $5,871.18 | $4,489.62 |
| 01/01/14 | 01/31/14 | 02/24/14 | $6,156.18 | $4,489.62 |
| 02/01/14 | 02/28/14 | 03/20/14 | $5,782.84 | $4,055.13 |
| 03/01/14 | 03/31/14 | 04/29/14 | $6,181.18 | $4,489.62 |
| 04/01/14 | 04/30/14 | 05/20/14 | $6,387.90 | $4,344.79 |
| 05/01/14 | 05/31/14 | 06/30/14 | $6,481.18 | $4,489.62 |

Case 3:14-cv-00212-TAV-HBG   Document 57   Filed 10/11/16   Page 43 of 49   PageID #: 244

| 06/01/14 | 06/30/14 | 07/18/14 | $5,728.40 | $4,344.79 |
|----------|----------|----------|-----------|-----------|
| 07/01/14 | 07/10/14 | 08/20/14 | $1,697.80 | $1,448.26 |
| **Totals** | | | **$306,878.40** | **$227,274.96** |

145.     Despite the auditor's finding in June 2013 that Patient 6's hospice eligibility and limited prognosis was "questionable" and that the documentation submitted for review for Patient 6 was insufficient to support hospice eligibility during the April 2013 time period, Caris did not return any of the payments it received for Patient 6 for claims submitted based on the physician certification(s) that covered the April 2013 time period (i.e., the claims submitted for the months April and May 2013).

146.     Upon information and belief, Caris also did not undertake adequate due diligence of Patient 6's medical records and certifications to determine whether Patient 6 had been hospice-eligible before April 2013 and, if not, whether it had an obligation to return overpayments it had received from Medicare for services rendered prior to April 2013. Therefore, upon information and belief, Caris knowingly retained overpayments related to some or all of the claims Caris submitted for Patient 6 prior to April 2013.

147.     In addition, despite the auditor's findings in June 2013 that that Patient 6's hospice eligibility and limited prognosis was "questionable" and that the documentation submitted for review for Patient 6 was insufficient to support hospice eligibility during the April 2013 time period, Caris continued to submit claims for Patient 6 in and after June 2013. Yet, upon information and belief, Caris did not monitor or reevaluate Patient 6 to determine whether Patient 6 was hospice-eligible in and after June 2013. Therefore, upon information and belief, Caris knowingly submitted false claims for Patient 6 in and after June 2013.

44

148.    A list identifying Patients 1, 2, 3, 4, 5 and 6 discussed above is being provided under separate cover to Defendants.

## FIRST CAUSE OF ACTION
### (False Claims Act-31 U.S.C. § 3729(a)(1)(A))

149.    The United States re-alleges and incorporates by reference the allegations of paragraphs 1 through 148.

150.    By virtue of the acts described above, between June 2013 and December 2013, Defendant Caris knowingly presented or caused to be presented to the United States false or fraudulent Medicare claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A); that is, defendant Caris knowingly made or presented, or caused to be made or presented, to the United States claims for payment for hospice services for patients who were not eligible for Medicare hospice benefits during all or part of the time the patients were on hospice service.

151.    By reason of the foregoing, the United States suffered actual damages in an amount to be determined at trial; and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and not more than $11,000 per claim. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999), the civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

## SECOND CAUSE OF ACTION
### (False Claims Act-31 U.S.C. § 3729(a)(1)(G))

152.    The United States re-alleges and incorporates by reference the allegations of paragraphs 1 through 148.

153. By virtue of the acts described above, between April 2010 and June 2013, Defendant Caris knowingly made or used a false record or statement material to an obligation to pay or transmit money to the United States, or knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the United States, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

154. Such false records or statements or knowing concealment, avoidance or decrease of an obligation to pay or transmit money to the United States were made or done knowingly, as defined in 31 U.S.C. § 3729(a)(1).

155. By reason of the foregoing, the United States suffered actual damages in an amount to be determined at trial; and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,000 and not more than $11,000 per claim. Pursuant to the Federal Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999), the civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

### THIRD CAUSE OF ACTION
### (Payment Under Mistake of Fact)

156. The United States re-alleges and incorporates by reference the allegations of paragraphs 1 through 148.

157. This is a claim for the recovery of monies paid to Defendants under mistake of fact.

158. The above-described false claims and false statements which defendant Caris submitted to the United States through the Medicare Program (or used as a basis for Medicare reimbursement) constituted misrepresentations of material fact in that they misrepresented the

46

eligibility of the patient beneficiaries, as well as other facts necessary to establish entitlement to reimbursement for hospice benefits under the Medicare Program.

159.    As a consequence of the conduct and the acts set forth above, Defendant Caris was paid by mistake by the United States in an amount to be determined at trial which, under the circumstances, in equity and good conscience, should be returned to the United States.

## FOURT CAUSE OF ACTION
### (Unjust Enrichment)

160.    The United States re-alleges and incorporates by reference the allegations of paragraphs 1 through 148.

161.    This is a claim for recovery of monies by which defendant Caris has been unjustly enriched.

162.    By virtue of the conduct and the acts described above, defendant Caris was unjustly enriched at the expense of the United States in an amount to be determined, which, under the circumstances, in equity and good conscience, should be returned to the United States.

## FIFTH CAUSE OF ACTION
### (Conversion)

163.    The United States re-alleges and incorporates by reference the allegations of paragraphs 1 through 148. By virtue of the acts described, and specifically by submitting claims and obtaining payment for hospice services as described above, Defendants have appropriated the United States' property to their own use and benefit, and have exercised dominion of such property in defiance of the United States' rights.

47

## PRAYER FOR RELIEF

WHEREFORE, the United States respectfully prays for judgment in its favor as follows:

a. As to First and Second Causes of Action (False Claims Act), against Caris for: (i) statutory damages in an amount to be established at trial, trebled as required by law, and such penalties as are required by law; (ii) the costs of this action, plus interest, as provided by law; and (iii) any other relief that this Court deems appropriate, to be determined at trial.

b. As to the Third Cause of Action (Payment Under Mistake of Fact), for: (i) an amount equal to the money paid by the United States through the Medicare Program to Caris and illegally retained by Caris, plus interest; (ii) the costs of this action, plus interest, as provided by law; and (iii) any other relief that this Court deems appropriate, to be determined at trial.

c. As to the Fourth Cause of Action (Unjust Enrichment), for: (i) an amount equal to the money paid by the United States through the Medicare Program to Caris, or the amount by which Caris was unjustly enriched, plus interest; (ii) the costs of this action, plus interest, as provided by law; and (iii) any other relief that this Court deems appropriate, to be determined at trial.

d. As to the Fifth Cause of Action (Conversion), for: (i) an amount equal to the money paid by the United States through the Medicare Program to Caris and illegally retained by Caris, plus interest; (ii) the costs of this action, plus interest, as provided by law; and (iii) any other relief that this Court deems appropriate, to be determined at trial.

e. for all other and further relief as the Court may deem just and proper.

48

Dated: October 11, 2016

Respectfully submitted,

NANCY STALLARD HARR
United States Attorney

By: _____

JEREMY DYKES, Maryland Bar Member
JESSICA R. SIEVERT, Fla. Bar No. 55839
ROBERT C. MCCONKEY, III, BPR #018118
Assistant United States Attorneys
800 Market St., Suite 211
Knoxville, TN 37902
(865) 545-4167
Jeremy.Dykes@usdoj.gov
Jessica.Sievert@usdoj.gov
Robert.McConkey@usdoj.gov

49